# IN THE SUPREME COURT OF IOWA

No. 18–0563

Filed March 6, 2020

**STATE OF IOWA,**

    Appellee,

vs.

**JARROD DALE MAJORS,**

    Appellant.

---

Appeal from the Iowa District Court for Taylor County, John D. Lloyd, Judge.

Defendant appeals from a second resentencing order imposing a mandatory minimum sentence for attempted murder committed as a juvenile. **AFFIRMED.**

Bradley Bender, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Louis S. Sloven, Assistant Attorney General, and Clinton L. Spurrier, County Attorney, for appellee.

**WATERMAN, Justice.**

In this appeal, we must decide whether the district court abused its discretion by imposing a seventeen and one-half-year mandatory minimum prison term before parole eligibility on the defendant's second resentencing for attempted murder during a home invasion and whether defense counsel provided constitutionally deficient representation. The defendant was age seventeen at the time of the crime in 2002, and he has been resentenced twice as our caselaw on juvenile sentencing evolved. *See State v. Majors*, 897 N.W.2d 124, 127 (Iowa 2017) (remanding for resentencing in light of *State v. Roby*, 897 N.W.2d 127 (Iowa 2017) (plurality opinion), decided the same day). The defendant, now age thirty-five, appeals his latest resentencing, contending that the district court failed to follow our court's 2017 mandate to apply *Roby* and that his counsel was ineffective for failing to present a defense expert on the youth sentencing factors. We retained the appeal.

On our review, we determine the district court did not abuse its discretion by imposing the mandatory minimum after considering the youth sentencing factors under *Roby*. The sentence is supported by testimony from the State's expert. The defendant personally chose not to retain a defense expert, and we conclude his counsel was not constitutionally ineffective for relying on cross-examination of the State's expert without retaining a defense expert that his client chose to forgo. Accordingly, we affirm the district court's judgment of sentence.

## I. Background Facts and Proceedings.

On May 30, 2002, Jarrod Dale Majors was a seventeen-year-old high school senior fifteen days away from his eighteenth birthday. He lived with his parents on a quiet street in Bedford, Iowa. Majors had become obsessed with Hollie Peckham, a thirty-year-old woman who lived across

the street with her thirty-two-year-old husband, Jamie Peckham, and their twenty-two-month-old twins. While the Peckhams were away one evening, Majors entered their home, hid inside the closet of the master bedroom, and awaited their return. Majors wore a ski mask and gloves to avoid identification. He attached a large knife to his waistband, wrapped a roll of duct tape around his wrist, and held a .22 caliber rifle with a plastic soda bottle taped to the barrel to act as a makeshift silencer.

When the Peckhams returned home, Hollie went upstairs while Jamie remained downstairs with the twins. As Hollie entered her bedroom, Majors emerged from the closet and attacked while pointing the gun at her. Hollie screamed for her husband, and Majors told her that he was not there, which led Hollie to believe Majors had killed him. She ran out of the bedroom, down the stairs, and out of the house screaming for help. Hollie found a neighbor, who accompanied her back to the Peckham home while his wife called the police. Meanwhile, Jamie subdued Majors after a struggle witnessed by the toddlers. The neighbor helped Jamie restrain Majors until the police arrived. Jamie later testified that he knew who the assailant was before removing his ski mask because he had repeatedly seen Majors trespassing and peering in bathroom windows at Hollie over the preceding two years. Hollie injured her ankle during the incident, and the entire family was emotionally traumatized. Jamie described it at the most recent resentencing hearing as "[k]ind of feel[ing] like there's a 9-11 that happened where we survived, but it changed everything. It's a watershed moment."

Majors initially told the police that he was paid $100 to commit the crime as a prank. His story later changed to claiming he had been hallucinating and could not remember the crime due to using drugs and prolonged sleep deprivation. As motive for his crime, he claimed to believe

that Jamie was going to attack him and poison his dog. Majors had no prior criminal record apart from a single offense for possession of alcohol as a minor.

Majors pled guilty to attempted murder in exchange for the State's agreement to dismiss the remaining ten charges upon the expiration of the appeal deadline and on the condition that there would be no appeal. Majors was sentenced on January 22, 2003, to a prison term of up to twenty-five years with a mandatory minimum of seventeen and one-half years before parole eligibility. Majors appealed the sentence in violation of the plea agreement, prompting the county attorney to refile the dismissed counts. On May 13, Majors entered into a second plea agreement by pleading guilty to burglary in the second degree. He was sentenced to a ten-year term for that charge, which was to be served consecutively to his sentence for attempted murder. In exchange, the State agreed to amend the charge of burglary from first to second degree and to dismiss the remaining charges after the appeal deadline as long as Majors did not appeal. Majors did not file a direct appeal from his sentence.

In 2014, we decided *State v. Lyle*, holding that any automatic mandatory minimum sentences of imprisonment for youthful offenders violated the Iowa Constitution's provision against cruel and unusual punishment. 854 N.W.2d 378, 404 (Iowa 2014). Majors filed for a resentencing hearing based on *Lyle*. On September 16 of that year, when Majors was thirty years old, the district court conducted a resentencing hearing applying the *Lyle* factors.

Majors was resentenced to a term of incarceration of up to twenty-five years for attempted murder with a mandatory minimum of seventeen and one-half-years before parole eligibility. His ten-year sentence on the burglary conviction remained in place with the sentences to be served

consecutively. Majors appealed, and the court of appeals affirmed the sentence after determining the district court had properly considered the *Lyle* factors. On further review, we determined that the district court abused its discretion by imposing a minimum period of incarceration without eligibility for parole under *Roby*, decided the same day. *Majors*, 897 N.W.2d at 127. We reversed Majors' sentence and remanded for a second resentencing consistent with the *Lyle* factors as explained in *Roby*, which stated that "the factors must not normally be used to impose a minimum sentence of incarceration without parole unless expert evidence supports the use of the factors to reach such a result." 897 N.W.2d at 147.

At the second resentencing hearing on March 5, 2018, when Majors was age thirty-three, defense counsel told the court his client chose not to retain an expert, and the court conducted a colloquy to confirm this was Majors' own decision:

> MR. BOOTH: . . . I've had discussions with Mr. Majors in regard to whether or not we should have requested or tried to obtain an independent psychiatric evaluation since we knew the State was intending to call a psychiatrist to testify and to subject the defendant to a psychiatric evaluation on behalf of the State.
>
> In my discussions with Mr. Majors, it's my understanding that he does not wish to delay these proceedings any longer, that he is comfortable proceeding without the assistance of an independent psychiatric evaluation, Your Honor. . . .
>
> [the Court swore in Majors]
>
> . . . .
>
> MR. BOOTH: I've also advised you that we could ask the court for State funds in order to hire a psychiatrist or conduct an independent psychiatric evaluation to support your position at sentencing. Are you aware of that?
>
> THE DEFENDANT: Yes.
>
> MR. BOOTH: And was it your decision that we not hire an independent or obtain an independent evaluation?

THE DEFENDANT: Yes.

MR. BOOTH: Was that because your belief is that we should proceed -- your desire is to not have any further delays and proceed with resentencing; is that correct?

THE DEFENDANT: That's correct.

MR. BOOTH: Thank you, Your Honor.

THE COURT: Mr. Majors, without telling me what [you and] Mr. Booth discussed, do you feel you've had enough time to discuss this issue with him, or would you like some more time to discuss it with him?

THE DEFENDANT: I believe I've had enough time.

THE COURT: Is it your decision that you not ask for any further continuances?

THE DEFENDANT: Yes, my decision.

The court additionally offered to leave the record open to give Majors an opportunity to submit additional evidence later, but Majors declined the offer.

The hearing proceeded with live testimony from two witnesses: Deputy Nate Bucher and Dr. Theresa Clemmons, a psychiatrist at the department of corrections serving as the State's expert. Jamie Peckham gave an oral victim-impact statement.

Dr. Clemmons formed her opinions after reviewing Majors' records and interviewing him by teleconference. Dr. Clemmons noted Majors' prior inconsistent statements regarding his mindset during the crime, but she stated that "when we discussed what happened he was able to tell me specifically" what he did and that Majors admitted he did not do the crime on a dare. Dr. Clemmons testified that "[she did not] believe he's taking full responsibility for the entirety of all of his actions the night of the offense." The prosecutor and defense counsel each questioned Dr. Clemmons extensively regarding her conclusions under the five sentencing factors. Those factors are

(1) the age of the offender and the features of youthful behavior, such as "immaturity, impetuosity, and failure to

appreciate risks and consequences"; (2) the particular "family and home environment" that surround the youth; (3) the circumstances of the particular crime and all circumstances relating to youth that may have played a role in the commission of the crime; (4) the challenges for youthful offenders in navigating through the criminal process; and (5) the possibility of rehabilitation and the capacity for change.

*Lyle*, 854 N.W.2d at 404 n.10 (quoting *Miller v. Alabama*, 567 U.S. 460, 477–78, 132 S. Ct. 2455, 2468 (2012)); *see also Roby*, 897 N.W.2d at 135 (quoting same factors).

The prosecutor began with the first factor.

The first one is the youthful offender status or fact, that the person was in fact not 18 years old at the time of the commission of the crime.

. . . .

Q. In looking at that factor, how did you think that played into the defendant's situation in this case? In other words, do you feel that his status in the case at the time this happened would mitigate his responsibility for what happened, substantially or minimally mitigate it? A. I would say more so minimally mitigate it. Looking at the overall youthful offender, the idea of a youthful offender is the idea of brain maturing and whether brains mature enough to make good decisions, whether you have good control of your emotions, good control [over] impulsivity, have good development of your frontal lobe specifically, and the idea of that is that over time your brain does develop, it matures.

But looking at his age, from 17 years and 50 weeks to 18 years is a very small change. It's not a switch. It's not on an 18th birthday you flip a switch and the brain is fully mature. It actually takes much longer than the 18th birthday to reach the full maturity, and some people say your brain is ever changing during your lifetime, and we have no mark for full brain maturity.

So looking at kind of those ideas, there would have been minimal brain change or brain growth or brain development within those two weeks. So it wouldn't have necessarily changed his ability to make decisions, his ability to control emotions better or worse, his ability to have impulse control, that sort of thing.

. . . .

Q. So in terms of mitigating his responsibility for the crime, at best [the first factor] would have minimal mitigating value; would that be fair? A. Yes.

On cross-examination, Dr. Clemmons stated that she was looking at this factor from the perspective of whether Majors was a risk to all parties involved and emphasized her focus on whether he displayed any empathy. Majors' counsel asked whether she thought Majors may not have contemplated the risks and consequences to the victims, and she replied that she did not specifically ask him that so she could not answer.

The prosecutor's direct examination then elicited the expert's testimony on the second factor, Majors' supportive family and home environment.

> A. He described his family as supportive. He described his relationship with his mother as a good relationship. He and his mother still have frequent visits, and they talk regularly. He mentioned that his mother was supportive growing up. He denied any abuse.
>
> He did mention with his father the physical abuse that we talked about, but he did mention that through the years that he and his father did have a good, supportive relationship over the years, also came up for visits as well.
>
> And then him and his brother also have a good relationship, from my understanding. Growing up they had some similar friends. And they denied any abuse going back and forth. He mentioned they would have had, you know, the typical brother relationship where they probably roughhouse a bit and that but no abuse back and forth between the boys.
>
> Q. So the only negative he described to you in relation to his family relationship was a period of prior abuse by his father; is that correct? A. Yes.
>
> Q. And that would have ended when he would have been roughly in sixth grade; correct? A. Yes, he mentioned the physical abuse ended in sixth grade.
>
> Q. He described to you after that period of time he and his father developed a good relationship? A. To my understanding, yes.

Dr. Clemmons testified that Majors' other familial relationships with his brother and mother had been good at the time of the crime and continue to be, that there were no substance abuse issues within the family or other

abuse, and that it would be fair to say that Majors basically described a positive, supportive family.

> Q. So again in terms of this factor, did you say anything about his home environment or relationship would mitigate his actions in terms of the crime? A. At the time of the offense, there didn't appear to be anything going on within the family that would have mitigated anything.
>
> Q. The people that you deal with in the prison system, is it fairly common that many of them have very troubled home lives? A. Absolutely.
>
> Q. And that's contributed to them being where they're at; would that be fair to say? A. Absolutely.
>
> Q. And you didn't see anything in this case; did you? A. Not at the time of offense.
>
> Q. Would it be fair to say that factor would have minimum mitigating value in this case? A. Yes.

Majors' counsel cross-examined Dr. Clemmons regarding how Majors' childhood scoliosis, surgery in the sixth grade, and his inability to participate in sports affected his home environment. In response, she noted she was focusing on his home environment at the time of the crime many years later.

The prosecutor then turned to the third factor, the circumstances of the crime, in which Dr. Clemmons noted the absence of peer pressure.

> Q. The next factor I wanted to look at is the circumstances of the crime and I think in terms of the Iowa Supreme Court looking at the issue of outside influences significantly. Did you look at that issue as well in relation to the defendant? A Yes.
>
> Q. And in terms of involvement of other youthful people with him, did you find any evidence of that in this particular case? A. No, I did not.
>
> Q. I believe the supreme court case indicated if they were jointly committing crimes with others. In this case is there any evidence whatsoever that anyone else participated with the defendant in the commission of this crime? A. No.
>
> Q. Is there any indication that anybody else was involved in the planning or preparation for this crime? A. No.

> Q. In terms of those factors such as peer pressure, did he indicate to you any indication that peer pressure played a role in what he did that night? A. No.

Dr. Clemmons went on to state that she would not classify Majors' crime as an impulsive one, but rather it appeared to be planned given the clothing to mask his identity, the rifle with a makeshift silencer, and the knife as a backup weapon.

> Q. In terms of what we have here, we have one who had a well thought out crime and did so in a way that was going to minimize their likelihood of being caught and held accountable; would that be correct? A. That is correct.

> Q. Again in terms of the circumstances of the crime, would you say that the factors and circumstances would provide minimal mitigating value of the defendant's youthful offender in this case? A. Correct.

On cross-examination, defense counsel challenged Dr. Clemmons about impulsivity and her belief that this was a planned crime.

When discussing the fourth factor, the defendant's competency to navigate legal proceedings, Dr. Clemmons testified on direct that she had reviewed Majors' competency evaluation from his forensic psychiatric hospitalization close in time to the crime.

> Q. And were you able to determine from that whether the defendant was competent to understand what he was doing in terms of being able to assist in his defense in the case that was pending against him? A. Yes. . . . In the letter from Dr. Hartman from August 2, 2002, Dr. Hartman mentions that Mr. Majors was competent to participate in judicial proceedings. He stated he currently does not have a mental condition which prevents him from appreciating his charge, understanding the proceedings or assisting in his own defense.

> I reviewed his history and available data surrounding the activities in question and would indicate that Mr. Majors understood the nature and quality of behavior in which he was allegedly involved. That statement and information would indicate at that time he had sufficient competency to distinguish right from wrong. It is equally this writer's opinion that at this time he had capacity to form intent consistent with accountability.

Dr. Welch, who was also the psychologist who met with him, stated he does appear to be well aware of the charges against him and can aid in his own defense.

So both a licensed psychologist and a psychiatrist mentioned that they thought he had no -- there was no concern for diminished capacity or competency at that time.

Q. And that was based on an evaluation done in July of 2002; correct? A. Yes, that is correct.

Q. Would you have expected that from May 25, 2002, when the evaluation was done, any reasonable likelihood there would have been a significant change in his mental capacity and competency during that small window of time? A. None of the information I have would have indicated that, no.

Q. In this case would you say it's also significant that to an extent the defendant kind of throughout the progress of this case kind of went through a checklist of more or less minimizing any responsibility? First someone there, to offering me money, next thing I've got a mental competency issue, I don't understand to the point of asking other prisoners how to make it sound more effective, to I'm not responsible because of use of drugs and a blackout? A. It seemed that he was definitely trying to find ways to reduce his responsibility for the actions that he had performed.

Q. And doing ways recognized by the legal system; correct? A. Correct.

Q. Diminished capacity would provide a potential legal defense; correct? A. Correct.

Q. So would substance abuse intoxication? A. Correct.

Q. Again I would ask you in this case do you feel that, based upon your information, that the defendant was fully able to understand the legal proceedings and navigate the legal system at that time? A. I don't have any information to the contrary.

Q. So again this would be another minimal mitigating value in terms of his being a youthful offender; correct? A. Yes.

Defense counsel cross-examined Dr. Clemmons about Majors' difficulty in school.

In terms of going into the alternative school, it sounds like a smaller class size, more attention, and also he mentioned to me it was only three hours a day versus the full seven to eight hours of schooling, which was his preference.

Lastly, Dr. Clemmons addressed the fifth factor, capacity for rehabilitation, recognizing in this case that they had the benefit of sixteen years of hindsight since this 2002 crime, Majors' prison disciplinary history, and his long-standing and continuing lack of empathy and remorse.

> Q. And in terms of his rehabilitative capacity, what would your thoughts be in that area? A. I have several thoughts in that area. He does have . . . the ability in terms of understanding what the treatment program would be like. His IQ is good, so he would be able to understand the content.

> He does not have any behavior problems right now. He hasn't had disciplin[e] since 2014, so there wouldn't be any problems with him sitting in class, going through treatment, performing those kind of things.

> The main point that I've been concerned about -- and I think this was also mentioned in the presentence investigation from 2002 but really gets him out of his evaluation -- was the concern for feelings of remorse, empathy for the victims and also feelings of guilt for his actions.

> That really comes down to the core of what the rehabilitation is in terms of taking responsibility for the action, admitting wrongdoing and then going through that treatment with kind of that desire to want to change so that way in the future whatever underlying factor led you to that offense doesn't lead you to that offense in the future.

> Q. Or other offenses? A. Right.

> Q. In this case did you feel that the defendant showed remorse for what he had done? A. I didn't get that sense, no.

> Q. We've already talked about the victim empathy and accepting responsibility issues. And so together with those three, in your opinion, do you think those things all will reduce the effectiveness of full rehabilitation in relation to the defendant? A. That would reduce the rehabilitation, correct.

> Q. If you're looking at whether the prospect of him being a good candidate for parole rehabilitation, that would be something that, based upon the information you've looked at and reviewed, you would say he's not a good prospect for full rehabilitation; would that be fair? A. I would say that's correct.

> Q. Again in evaluating this factor, rehabilitation would be something that would be a minimal mitigating value in our analysis of assessment of what the appropriate sentence would be; would you say that's fair? A. Yes.

On cross-examination, Dr. Clemmons acknowledged that Majors had shown a capacity for change since 2014 and that Majors apologized to the Peckhams at his previous sentencing hearings, but she noted his motive for secondary gain. Dr. Clemmons admitted to working primarily with adults and that Majors' was her first resentencing hearing on the *Miller/Lyle/Roby* factors.

The district court subsequently issued its resentencing order stating, "The court will consider the five factors as applied to this case, in light of the explication of those factors contained in *Roby*." The court outlined in considerable detail *Roby*'s description of each factor and its analysis of each factor's application to Majors' case.

Regarding the first factor, age and maturity, the district court noted that Majors was fifteen days shy of his eighteenth birthday at the time of the crime, and found

> it [was] reasonable to assume that he would have been more mature than a 15 or 16 year old defendant and not appreciably less mature than if he had committed the crime two weeks later, at which point he would have been treated as an adult without question.

Elaborating, the district court cited to the evaluation done at the Iowa Medical and Classification Center at Oakdale two months after the crime that opined Majors understood the nature and quality of his behavior and noted that he had been soliciting help from other inmates regarding how to look more psychiatrically ill to aid in his defense. The district court acknowledged that the report identified Majors as having "limited insight and impaired judgment and being emotionally immature" as well as being a loner bullied throughout his childhood. Noting *Roby* emphasized the importance of expert testimony, the district court referenced Dr. Clemmons' determination that there was nothing about Majors' age

that mitigated against a mandatory sentence. "It does not appear to the court that the defendant's age is a mitigating factor in light of the contemporaneous assessment and the current psychiatric testimony."

Turning to the second factor, the family and home environment, the district court noted that "[n]o one point[ed] to any home environment facts that influenced the defendant's behavior." Indeed, Majors had no juvenile criminal history apart from a single offense of possession of alcohol. The court referred to the physical abuse by Majors' father until about the sixth grade, noting the father–son relationship subsequently improved and was "in good shape" at the time of the crime. Majors himself had denied any abuse issues, and his father had contacted the facility where Majors was being held numerous times to advocate for greater phone access. The district court noted, "Dr. Clemmons also did not identify any family or household issues that in her opinion would have mitigated the offense. The court concludes that this factor does not mitigate the defendant's conduct."

In considering the third factor, the circumstances of the crime and attendant youth factors, the district court determined,

> This crime was a solo act by the defendant. There was no one involved who encouraged or goaded the defendant into acting. There is no indication that he was in any way seeking to curry favor with or win approval of any peer group.

The court relied in part on the Oakdale report and Dr. Clemmons' testimony.

> Dr. Clemmons also found no indications of any outside influences on the defendant in the planning and execution of this crime. In addition, she noted the deliberate nature of the crime -- the use of a ski mask and gloves, shoes with no identifiable tread, a rifle with a homemade silencer attached and a backup weapon -- was supportive of a finding that the defendant was acting for himself and not impulsively or at the behest of another.

The district court emphasized the conclusions in the Oakdale report that in 2002 Majors *"understood the nature and quality of [his] behavior [and] at that time he had the capacity to form intent consistent with accountability."* The district court concluded that the third factor was not mitigating.

Regarding the fourth factor, competency to navigate the legal system, the district court stated it "fails to see how this factor mitigates in the defendant's favor" and explained why:

> While the crime occurred when the defendant was still a minor, the only part of the criminal proceeding that occurred while he was a minor was his initial *appearance and his preliminary hearing* at which he successfully obtained dismissal of two counts that had been filed initially. The entire remainder of this criminal proceeding took place after he had attained legal adult status. In addition, he was evaluated for competency to stand trial as noted above. This evaluation occurred in July 2002 and preceded the bulk of the proceedings in this case. This evaluation found him competent to assist in his own defense and to stand trial.
>
> As an additional consideration, the defendant demonstrated an understanding of the legal system that belies any disability due to his age. He claimed to be suicidal in order to get out of the Taylor County jail. He sought an evaluation of his competency in order to try to aid his case. He solicited other inmates at Oakdale for ideas on how he could appear more worthy of a determination of psychiatric incompetency. He tried out various lies in an effort to frame an explanation that would allow him to avoid or ameliorate his culpability. None of those actions indicate a defendant overwhelmed by the system due to his age or immaturity. Dr. Clemmons also found nothing in the 2002 evaluation that would indicate that the defendant was overwhelmed by the system and pointed in her testimony to these additional factors as support for that conclusion.

Finally, the district court turned to the fifth factor, capacity for reform, and noted that if it were only considering the defendant at the time of the original sentencing in evaluating this factor, his youth and potential to reform might weakly mitigate in Majors' favor. Focusing on Dr. Clemmons' testimony, the court recognized her concern that Majors has never shown empathy for the victims of his crime and his lack of

empathy "was a trait he brought to prison with him."  The court expressed uncertainty over how to consider Majors' prison conduct when evaluating this factor, but concluded, "The only factor that came close to favoring mitigation, the possibility of reform, is further weakened if not destroyed by his prison conduct."  Majors had numerous prison disciplinary violations before *Lyle* was decided in 2014.  His behavior improved after our decision in *Lyle*, but he committed another major violation (providing a fake urine sample to fool a urinalysis) upon returning from his 2018 resentencing hearing.  The court concluded the fifth factor "would mitigate in the defendant's favor, albeit somewhat weakly in the court's assessment."

The district court determined "[a] mandatory minimum sentence, in the absence of mitigating factors and the presence of 'a frightening crime,' seems appropriate" and that

> after careful consideration of the *Lyle* factors . . . the mandatory minimum sentence for adults convicted of attempted murder applies to this defendant and that he should be subject to serve 70% of the sentence before becoming eligible for parole.

The court resentenced Majors on the charge of attempted murder to the same sentence as before, twenty-five years imprisonment with eligibility for parole after serving a mandatory minimum of seventeen and one-half-years.  The district court concluded that Majors' sentence for burglary was not up for resentencing, and it remained a ten-year sentence that would run consecutively to his sentence for attempted murder.

Majors filed this direct appeal, which we retained.

## II.  Standard of Review.

If the sentence imposed is within the statutory limits, as it is here, we review for an abuse of discretion.  *Roby*, 897 N.W.2d at 137.  As we explained in *Roby*,

> A discretionary sentencing ruling, similarly, may be [an abuse of discretion] if a sentencing court fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only appropriate factors but nevertheless commits a clear error of judgment by arriving at a sentence that lies outside the limited range of choice dictated by the facts of the case.

*Id.* at 138 (alteration in original) (quoting *People v. Hyatt*, 891 N.W.2d 549, 578 (Mich. Ct. App. 2016), *judgment affirmed in part and reversed in part by People v. Skinner*, 917 N.W.2d 292, 295 (Mich. 2018)).  "Sentencing decisions of the district court are cloaked with a strong presumption in their favor."  *State v. Crooks*, 911 N.W.2d 153, 171 (Iowa 2018); *see also State v. Formaro*, 638 N.W.2d 720, 724 (Iowa 2002).

We review ineffective-assistance-of-counsel claims de novo.  *State v. Ortiz*, 905 N.W.2d 174, 179 (Iowa 2017).  Normally such claims are preserved for postconviction-relief actions, but ineffective-assistance-of-counsel claims can be resolved on direct appeal when the record is sufficient to allow a ruling.[1]  *State v. Wills*, 696 N.W.2d 20, 22 (Iowa 2005).

## III.  Analysis.

Majors argues that the district court abused its discretion by imposing a mandatory minimum sentence on remand and that his trial

---

[1]In *State v. Macke*, we held that the 2019 amendment to Iowa Code section 814.7 does not apply to a direct appeal from a judgment and sentence entered before the statute's effective date of July 1, 2019.  933 N.W.2d 226, 228 (Iowa 2019).  Although under the current version of Iowa Code section 814.7 Majors would not have a right to direct appeal on an ineffective-assistance-of-counsel claim, he did have such a right at the time his judgment and sentence was issued on April 2, 2018.  As such, we will consider Majors' ineffective-assistance-of-counsel claim in this appeal.

counsel was ineffective in failing to present expert testimony on the *Lyle* factors at his 2018 resentencing. The State responds that the district court properly applied the *Lyle* factors and that the mandatory minimum was supported by expert testimony, while Majors' own decision to forgo retaining a defense expert precludes relief on his ineffective-assistance-of-counsel claim.

**A. No Abuse of Discretion.** Our decisions have clarified that the sentencing court must consider the *Miller*/*Lyle*/*Roby* factors in an individualized sentencing hearing if it is contemplating imposing a mandatory minimum sentence on a juvenile offender. *Roby*, 897 N.W.2d at 148. The State must prove the defendant's "irreparable corruption" for a life-without-parole sentence. *State v. Seats*, 865 N.W.2d 545, 556 (Iowa 2015). That proof is not required for a shorter mandatory minimum sentence.

We have given some procedural guidance. Our decision in *Roby* allows district courts to impose minimum terms of incarceration "after a complete and careful consideration of the relevant mitigating factors of youth." *Roby*, 897 N.W.2d at 148. Indeed, we stated that "'[i]f the mandatory minimum period of incarceration is warranted,' we commanded [our judges] to impose the sentence." *Id.* at 143 (alteration in original) (quoting *Lyle*, 854 N.W.2d at 404 n.10). If the factors are properly applied, "the constitutional guarantee against cruel and unusual punishment is satisfied." *Id.* at 145. "[T]he factors must not normally be used to impose a minimum sentence of incarceration without parole unless expert evidence supports the use of the factors to reach such a result." *Id.* at

147.[2] We now turn to addressing what the district court must find in order to impose a mandatory minimum sentence for a crime committed under age eighteen.

Our earlier opinions have been criticized for running the risk of "mak[ing] it difficult, if not practically impossible, for a sentencing judge to ever impose any minimum term of incarceration." *Id.* at 151 (Zager, J., dissenting); *see also State v. White*, 903 N.W.2d 331, 337 (Iowa 2017) (Mansfield, J., dissenting) ("Our court has extended *Miller* to all mandatory minimums but has yet to say what the substantive standard is. Plainly it isn't 'irreparable corruption' . . . . Still, our court hasn't told district courts what that standard is. This isn't about *moving* the goal posts. The court has yet to *erect* the goal posts."). Yet as we indicated in *Roby,* mandatory minimum sentences are permissible. While there is a presumption against minimum terms of incarceration for juvenile offenders, we have expressly upheld, even commanded, their use if the court concludes that sentence is warranted after consideration of the factors. *Roby*, 897 N.W.2d at 143 (plurality opinion). Such a conclusion does not need to rise to the level of irreparable corruption.

We reiterate that our role on review is for abuse of discretion. An abuse of discretion may exist if the sentencing court fails to consider a factor, gives significant weight to an improper factor, or arrives at a conclusion that is against the facts. *Id.* at 138. But if the court follows our outlined sentencing procedure by conducting an individualized

---

[2]The State stops short of asking us to overrule *Roby* or *Lyle*. As we recently noted in *Goodwin v. Iowa District Court*, "We do not ordinarily overrule our precedent sua sponte." 936 N.W.2d 634, 645 n.4 (Iowa 2019) (quoting *Estate of McFarlin v. State*, 881 N.W.2d 51, 59 (Iowa 2016)); *see also State v. Roberson*, 935 N.W.2d 813, 828 (Wis. 2019) (overruling precedent at the state's request to "return to our past practice of following decisions of the United States Supreme Court"). Adversarial briefing should guide a supreme court's weighty decision to overturn its precedent.

hearing, applies the *Miller/Lyle/Roby* factors, and imposes a sentence authorized by statute and supported by the evidence, then we affirm the sentence. *Goodwin v. Iowa Dist. Ct.*, 936 N.W.2d 634, 637 (Iowa 2019); *see also Seats*, 865 N.W.2d at 552–53 (explaining our review for abuse of discretion and emphasizing the discretionary nature of judges). As we stated in *Formaro*,

> Judicial discretion imparts the power to act within legal parameters according to the dictates of a judge's own conscience, uncontrolled by the judgment of others. It is essential to judging because judicial decisions frequently are not colored in black and white. Instead, they deal in differing shades of gray, and discretion is needed to give the necessary latitude to the decision-making process. This inherent latitude in the process properly limits our review. Thus, our task on appeal is not to second guess the decision made by the district court, but to determine if it was unreasonable or based on untenable grounds.

638 N.W.2d at 725 (citations omitted); *see also Seats*, 865 N.W.2d at 552–53. We trust the sentencing courts to know, after applying the factors, when a mandatory minimum term of incarceration for juvenile offenders is warranted. Such trust is essential to the "respect afforded by the appellate process." *Formaro*, 638 N.W.2d at 725.

We recently affirmed a twenty-year mandatory minimum on a fifty-year sentence for second-degree murder committed by a sixteen-year-old. *Goodwin*, 936 N.W.2d at 637. The sentencing court conducted an individualized sentencing hearing, relied on expert testimony in applying the *Miller/Lyle/Roby* factors, and imposed a sentence within the statutory limits. *Id.* at 645–47. Under circumstances in which two of the factors were mitigating, we determined that imposing the twenty-year mandatory minimum was neither illegal nor an abuse of discretion. *Id.* We reach the

same conclusion as to Majors' seventeen and one-half-year mandatory minimum prison term.[3]

Under the first factor, the sentencing court must consider "the age of the offender and the features of youthful behavior, such as 'immaturity, impetuosity, and failure to appreciate risks and consequences.' " *Lyle*, 854 N.W.2d at 404 n.10 (quoting *Miller*, 567 U.S. at 477–78, 132 S. Ct. at 2468).[4] The district court appropriately noted that Majors was nearly age eighteen when he committed the crime in 2002. Majors argues the court erred in emphasizing his age and states the fact that he was nearly eighteen at the time of the crime is "immaterial to the crucial question whether [he] possessed features of maturity beyond his years." We reject his attempt to alter the first factor. The court must consider "the age of the offender *and* the features of youthful behavior," which explicitly articulates that each is a separate consideration under this factor. *Id.* (emphasis added). The district court properly considered the present expert testimony of Dr. Clemmons and the 2002 Oakdale psychiatric

---

[3]The district court, as noted, relied in part on the testimony of the State's expert psychiatrist, Dr. Theresa Clemmons. Majors' trial counsel did not argue that Dr. Clemmons was unqualified to testify as an expert because she was not a child psychologist or child psychiatrist. Nor does Majors' appellate counsel argue that trial counsel provided constitutionally deficient representation by failing to challenge the admissibility of Dr. Clemmons' expert testimony on grounds that she was unqualified. "Generally, we have been committed to a liberal view on the admissibility of expert testimony." *Ranes v. Adams Labs., Inc.*, 778 N.W.2d 677, 685 (Iowa 2010). Indeed, we have stated that "an expert does not need to be a specialist in the area of the testimony as long as the testimony is within the general area of expertise of the witness." *Id.* at 687. In *Roby*, we nowhere specified that the state was limited to using expert testimony of a *child* psychologist or psychiatrist to support a mandatory minimum sentence. Such a limitation on expert testimony would make little sense when, as here, the offender was age thirty-three at the time of his second resentencing.

[4]"Studies that have examined logical reasoning abilities in structured situations and basic information-processing skills, for instance, have found no appreciable differences between adolescents age 16 and older and adults[.]" Laurence Steinberg et al., *Are Adolescents Less Mature Than Adults? Minors' Access to Abortion, the Juvenile Death Penalty, and the Alleged APA "Flip-Flop"*, 64 Am. Psychologist 583, 586 (2009).

assessment of Majors' decisional capacity contemporaneously with the criminal offenses. The record supports the district court's determination that Majors' maturity was comparable to a young adult and is not a mitigating factor.

Under the second factor, the sentencing court must consider "the particular 'family and home environment' that surround the youth." *Lyle*, 854 N.W.2d at 404 n.10 (quoting *Miller*, 567 U.S. at 477–78, 132 S. Ct. at 2468). "This factor seeks to identify any familial dependency and negative influences of family circumstances that can be ingrained on children" and considers the impact of all home environments, financial situations, and social backgrounds. *Roby*, 897 N.W.2d at 146. Majors, relying on an article that outlined resentencing considerations for a potential sentence of life without parole, urges that Dr. Clemmons should have interviewed family members, reviewed school reports, and utilized social maturity scales.[5] Such additional investigation is not required here, especially given that Majors was age thirty-three at the time of this second resentencing. Dr. Clemmons testified about how Majors had been picked on by other kids and noted a report of abuse by his father that ended when he was in sixth grade and had since improved. She found no mitigation given his childhood or the family environment at the time of the crime, in 2002, when Majors was living on a quiet street in a loving, two-parent household with good relationships with family members. The district court considered her expert testimony and noted the absence of "any home environment facts that influenced [Majors'] behavior." Unlike many youthful offenders raised in troubled home environments, Majors had no

---

[5]Elizabeth Scott et al., *Juvenile Sentencing Reform in a Constitutional Framework*, 88 Temp. L. Rev. 675, 696–97 (2016) (proposing considerations for a potential life-without-parole sentence).

juvenile criminal record apart from a single offense for possession of alcohol and thus had been able to conform his behavior to societal expectations before he invaded the Peckham home. The record supports the district court's determination that the second factor is not mitigating for Majors.

Under the third factor, the sentencing court must consider "the circumstances of the particular crime and all circumstances relating to youth that may have played a role in the commission of the crime." *Lyle*, 854 N.W.2d at 404 n.10. Here, our caselaw directs the sentencing judge to give attention to "the juvenile offender's actual role and the role of various types of external pressure." *Roby*, 897 N.W.2d at 146. As such, this factor is more relevant in situations of group participation in a crime. *Id.* For homicide offenses, this also involves consideration of "the way familial and peer pressures may have affected" the defendant. *State v. Zarate*, 908 N.W.2d 831, 853 (Iowa 2018) (quoting *Seats*, 865 N.W.2d at 556). "Our sentencing courts can and should consider the heinous nature of the crime in evaluating whether to impose a mandatory minimum sentence." *Goodwin*, 936 N.W.2d at 647.

Majors argues that the court did not give proper weight to his initial assertions that he had been dared to commit the crime, had been acting under direction of voices in his head due to drug use, and had blacked out. However, Dr. Clemmons testified that Majors himself admitted to her that he did not commit the crime on a dare, and his claim of being on a drug binge was inconsistent with other evidence. The district court appropriately relied on the absence of peer pressure, noting Majors acted alone without anyone goading him. The court's conclusion is supported by the expert testimony of Dr. Clemmons, who "found no indications of any outside influences . . . in the planning and execution of this crime."

Nor was the crime impulsive; to the contrary, Majors acted deliberately with careful planning. He observed the Peckham family for years, even watching Hollie, the object of his obsession, through bathroom windows. He learned their nightly routine, snuck into their home, and hid in Hollie's bedroom closet before emerging to attack her. He wore a ski mask and gloves to avoid detection. He brought duct tape presumably to bind her. He carried a rifle with a makeshift silencer and a knife as a backup weapon to subdue or kill his victims. As we observed in our prior decision, he committed a "frightening crime." *Majors*, 897 N.W.2d at 125. And the district court properly relied on present expert testimony and the 2002 contemporaneous Oakdale psychiatric assessment that at the time of the crime Majors understood the nature of his conduct and had the decisional capacity to be held accountable. The record supports the district court's determination that the third factor is not mitigating for Majors.

Under the fourth factor, the sentencing court must consider "the challenges for youthful offenders in navigating through the criminal process." *Lyle*, 854 N.W.2d at 404 n.10. "This factor recognizes that juveniles are typically less capable than adults at navigating the legal process." *Goodwin*, 936 N.W.2d at 647. But Majors was an adult throughout these criminal proceedings. Dr. Clemmons testified that the 2002 Oakdale assessment found him competent to assist in his own defense, and both a licensed psychologist and psychiatrist in 2002 found there was no concern that Majors had diminished capacity or competency. The record supports the district court's determination that Majors "demonstrated an understanding of the legal system that belies any disability due to his age." The record supports the district court's determination that the fourth factor is not mitigating for Majors.

Under the fifth factor, the sentencing court must consider "the possibility of rehabilitation and the capacity for change." *Lyle*, 854 N.W.2d at 404 n.10. This factor typically favors mitigation because juveniles are generally more capable of rehabilitation than adults. *Roby*, 897 N.W.2d at 147. Here, the district court appropriately gave weight to expert testimony on Majors' lack of empathy and remorse from his initial arrest to the present. And the district court properly considered Majors' prison disciplinary violations, which as Dr. Clemmons explained were not attributable to his youth because he continued to accrue violations as an adult. Even at age thirty-three, and on the same day as his 2018 resentencing, Majors committed another disciplinary violation. The record supports the district court's determination that the fifth factor is, at best, "weakly" mitigating for Majors.

The district court was unsure what weight to give Majors' conduct in prison. On resentencing, we encourage district courts to consider the defendant's conduct in prison—a sixteen-year span in this case. When initially sentencing a juvenile offender shortly after the crime, the district court must attempt to predict how the defendant will respond to the future opportunities to mature and rehabilitate himself while incarcerated. By contrast, we have observed that parole boards have

> "the benefit of seeing the individual offender's actual behavior, rather than having to attempt to predict chances at maturity and rehabilitation based on speculation." As a result, the parole board may decide to continue confinement of the juvenile "[i]f rehabilitation has not yet occurred" until he or she "has demonstrated through his or her own actions the ability to appreciate the severity of the crime." "This is consistent with the approach of our prior holdings in the area of juvenile sentencing, because it allows for a realistic and meaningful opportunity for parole upon the juvenile's demonstration of maturity and rehabilitation."

*State v. Harrison,* 914 N.W.2d 178, 201 (Iowa 2018) (quoting *State v. Propps,* 897 N.W.2d 91, 102 (Iowa 2017)). On resentencing, the court, like the parole board, can look back and rely on the defendant's actual behavior (good or bad) while incarcerated.[6] *See Crooks,* 911 N.W.2d at 170 (considering the "juvenile offender's progress towards rehabilitation" while incarcerated before imposing a new sentence). This may benefit some defendants. For example, in *State v. Louisell,* we affirmed a resentence that granted immediate parole eligibility to a juvenile offender who had served twenty-six years in prison, noting "Louisell is a model inmate who has achieved rehabilitation; grown from a naïve and impulsive youngster to a mature, accomplished, and intelligent woman; and accepted full responsibility for the crime she committed as a juvenile in 1987." 865 N.W.2d 590, 595 (Iowa 2015). Majors has not been a model inmate.

On balance, we determine the district court did not abuse its discretion in applying the foregoing factors to impose the seventeen and one-half-year mandatory minimum sentence. Importantly, as we reiterated in *Goodwin,* "[o]ur district courts can and should [also] weigh public safety (incapacitation), deterrence, and retribution when sentencing juvenile offenders for violent felonies." *Goodwin,* 936 N.W.2d at 647; *see also Harrison,* 914 N.W.2d at 201 ("Despite our emphasis on rehabilitation, juvenile sentences may still aim to promote additional penological goals, including deterrence, retribution, and incapacitation."); *Zarate,* 908

---

[6]Courts in other jurisdictions have held that prison disciplinary violations can be considered on resentencing. *See, e.g., State v. Swimm,* 340 S.E.2d 65, 70 (N.C. 1986) (allowing a defendant's bad conduct while incarcerated to be considered on resentencing); *Commonwealth v. Losch,* 535 A.2d 115, 123 (Pa. Super. Ct. 1987) (holding that during resentencing the judge "may also allow the prosecution to introduce evidence relating to appellant's *bad* conduct, if any, since the time that judgment of sentence was last imposed").

N.W.2d at 854–55 (approving consideration of other goals of criminal punishment when sentencing juvenile offenders, including incapacitation, deterrence, and culpability).

**B.  No Ineffective Assistance of Counsel.**  Majors argues his trial counsel had a duty to present an expert witness to testify regarding the five sentencing factors.  He asserts that his trial counsel's failure to present such an expert amounts to constitutionally deficient representation, that is, ineffective assistance of counsel.  The State contends that Majors cannot establish that his trial counsel was ineffective for failing to retain an expert witness because Majors himself, then age thirty-three, chose not to do so.  We begin with our framework for ineffective-assistance-of-counsel claims.

To prevail on an ineffective-assistance-of-counsel claim, the claimant must satisfy the two-prong test by proving that his trial counsel failed to perform an essential duty and prejudice resulted.  *State v. Clay*, 824 N.W.2d 488, 495 (Iowa 2012) (describing the two-prong test for ineffective-assistance-of-counsel claims set out in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)).  "A defendant's inability to prove either element is fatal."  *State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003).

Under the first prong, our presumption is that counsel performed competently unless the claimant proves otherwise by a preponderance of the evidence.  *Clay*, 824 N.W.2d at 495.  Counsel's performance is measured objectively against the prevailing professional norms after considering all the circumstances.  *Id.*  A claimant can rebut the presumption by showing that counsel failed to perform an essential duty.  *State v. Ross*, 845 N.W.2d 692, 698 (Iowa 2014).  More is required than a

showing that counsel's trial strategy backfired or the case would have been tried differently by another attorney. *Id.*

To establish the second prong, prejudice, "the claimant must prove by a reasonable probability that, but for counsel's failure to perform an essential duty, the result of the proceeding would have been different." *State v. Ary*, 877 N.W.2d 686, 705 (Iowa 2016). This proof does not require a showing that counsel's conduct "more likely than not altered the outcome in the case," but rather that "the probability of a different result is 'sufficient to undermine [our] confidence in the outcome' of the trial." *Id.* (alteration in original) (quoting *Graves*, 668 N.W.2d at 882).

The record must be adequate to resolve an ineffective-assistance-of-counsel claim on direct appeal. *Id.* at 704. We find that this record is adequate, and we hold that Majors' counsel did not breach an essential duty by failing to present a defense expert to testify regarding the sentencing factors. Our emphasis in *Roby* on the importance of presenting expert testimony on the *Miller*/*Lyle*/*Roby* factors was directed at the State—if the State wants to recommend that the sentencing court impose a mandatory minimum sentence, *Roby* held that an expert is "normally" necessary to analyze the factors. *Roby*, 897 N.W.2d at 148. Although the option of presenting an expert is available to both parties, the defendant does not need expert testimony in order to *avoid* a mandatory minimum sentence.

Majors himself made the decision not to present an expert during the resentencing hearing. Majors cannot now blame his counsel for honoring his own decision. *See Schertz v. State*, 380 N.W.2d 404, 413 (Iowa 1985) ("[A]ppellant cannot now assert a claim of ineffectiveness of counsel based primarily on appellant's own decisions . . . ."); *State v. Lemburg*, 257 N.W.2d 39, 46 (Iowa 1977) (rejecting a claim of ineffective

assistance of counsel for the attorney's alleged failure to litigate certain defenses because "[i]t was [the appellant's] own decision to reject the possibilities of these defenses").

Calling a defense expert would run the risk that the prosecutor's cross-examination would elicit adverse information. Majors' counsel made a strategic decision to rely on his own cross-examination of the State's expert. "We believe that the question of whether or not to call an expert witness is a matter of trial strategy." *Heaton v. State*, 420 N.W.2d 429, 432 (Iowa 1988); *see also State v. Polly*, 657 N.W.2d 462, 468 (Iowa 2003) ("Generally, the decision not to call a particular witness or the defendant to testify implicates a reasonable tactical decision."). Indeed, Majors' counsel referred to that strategy to support his client's decision to decline to keep the record open for a psychiatric examination and a defense expert.

> MR. BOOTH: . . . I'd like to indicate to the court again that I've again advised Mr. Majors that we could at this point ask for the record to remain open in order to get a psychiatric examination done. Again on my recommendation it's my understanding that he is declining to have that done at this time, Your Honor.
>
> THE COURT: Mr. Booth, without detailing the legal reason, can you place [on] record some reasons for your recommendation?
>
> MR. BOOTH: Well, with respect as indicated in my cross-examination, Your Honor, I believe that I was able to glean the information that I might otherwise be able to obtain through the State's witness, Your Honor, and in my personal opinion and my professional opinion, I believe that that should be sufficient, Your Honor. I'm not sure that an independent evaluation would provide the same or similar opportunity to present information.
>
> THE COURT: It seems like a reasonable choice of trial strategy, Mr. Booth.

We agree that this was a reasonable trial strategy rather than a breach of duty. *See State v. Ondayog*, 722 N.W.2d 778, 786 (Iowa 2006); *Polly*, 657 N.W.2d at 468 (holding that the defendant's ineffective-

assistance-of-counsel claim failed because "[t]rial counsel's decision not to call [the defendant] to testify clearly was a strategical decision we will not second-guess"); *State v. McKettrick*, 480 N.W.2d 52, 55 (Iowa 1992); *Heaton*, 420 N.W.2d at 432 (holding defense counsel was not ineffective for not calling an expert at trial); *Kellogg v. State*, 288 N.W.2d 561, 564 (Iowa 1980) ("[Defendant] shows no injury from [defense counsel's] decision not to consult the expert witnesses or use them at trial. He has failed to carry his burden of proving [defense counsel] was incompetent or in any way ineffective on this contention.").

We reiterate that these sentencing hearings need not be a battle of the experts. A "basic proposition" regarding this process is that "juvenile sentencing hearings are not entirely adversarial. The goal is to craft a 'punishment that serves the best interests of the child and of society.' " *Roby*, 897 N.W.2d at 144 (quoting *Lyle*, 854 N.W.2d at 402). Requiring the defense to present an expert in every juvenile sentencing case would not serve that goal.

We hold Majors' defense counsel had no duty to present an expert to testify regarding the *Miller/Lyle/Roby* factors. Given that Majors failed to prove the first element required to prevail on an ineffective-assistance-of-counsel claim, a breach of duty, we end our analysis there. *See Graves*, 668 N.W.2d at 869 ("A defendant's inability to prove either element is fatal.").

### IV. Disposition.

For the foregoing reasons, we affirm the district court's resentencing order and judgment of sentence.

**AFFIRMED.**

Christensen, C.J., and Mansfield and McDonald, JJ., join this opinion. McDonald, J., files a concurring opinion in which Christensen,

C.J., joins. Appel, J., files a dissenting opinion in which Wiggins, J., joins. Oxley, J., takes no part.

**McDONALD, Justice (concurring specially).**

For the reasons set forth in my special concurrence in *Goodwin v. Iowa District Court*, 936 N.W.2d 634, 649 (Iowa 2019) (McDonald, J., concurring specially), I conclude the district court did not abuse its discretion in imposing a minimum sentence on the defendant. I concur in the majority opinion and the judgment of the court.

Christensen, C.J., joins this special concurrence.

**APPEL, Justice (dissenting).**

I respectfully dissent.

The sentencing hearing in this case does not remotely resemble that contemplated by *State v. Roby*, 897 N.W.2d 127 (Iowa 2017), *State v. Seats*, 865 N.W.2d 545 (Iowa 2015), *State v. Lyle*, 854 N.W.2d 378 (Iowa 2014), and *State v. Null*, 836 N.W.2d 41 (Iowa 2013). The overarching problem is that the district court failed to recognize the principles of developmental child psychology that underlie our juvenile sentencing cases and entered a sentencing order that failed to apply the proper framework to this case. Further, counsel for Jarrod Majors made no effort to present the law or to show, through competent expert testimony, how the law related to the facts at hand. As a result, the sentence in this case should be vacated and the matter remanded for resentencing.

**I. By Failing to Recognize the Developmental Child Psychology Underpinning Our Caselaw and the Proper Framework for Considering Juvenile Culpability, the District Court Committed Reversible Error.**

**A. The Need for Qualified Expert Testimony on Developmental Child Psychology in Cases Where Juvenile Offenders Face the Possibility of the Imposition of Mandatory Adult Minimum Sentences.** The basic framework of the United States Supreme Court on juvenile justice fundamentally turns on concepts of developmental child psychology as articulated in the recent seminal trilogy of cases: *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455 (2012), *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011 (2010), and *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183 (2005).[7]

---

[7]"Developmental psychology, broadly defined, concerns the scientific study of changes in physical, intellectual, emotional, and social development over the life cycle." Laurence Steinberg & Elizabeth Cauffman, *The Elephant in the Courtroom: A*

We applied child developmental psychology under the article I, section 17 cruel and unusual punishment provision of the Iowa Constitution in *Roby*, *Seats*, *Lyle*, and *Null*. Under our caselaw, the state must show in an individualized hearing that a juvenile criminal defendant facing a mandatory adult sentence falls outside the norm of most juveniles, where age is presumptively considered a mitigating factor on the critical issue of culpability.

In *Roby*, we explored the contours of an individualized hearing required before the state may apply a mandatory adult minimum sentence against a juvenile offender. We noted that the mitigating developmental factor of "age of the offender and the features of youthful behavior" is most meaningfully applied when based on qualified professional assessments of the offender's decision-making capacity utilizing the expert's "developmental and clinical knowledge." *Roby*, 897 N.W.2d at 145 (first quoting *Lyle*, 854 N.W.2d at 404 n.10; then quoting Elizabeth S. Scott et al., *Juvenile Sentencing Reform in a Constitutional Framework*, 88 Temp. L. Rev. 675, 697 (2016) [hereinafter Scott et al., *Juvenile Sentencing Reform*]). As authority for its reliance on qualified professional assessments, the *Roby* court cited the work of four leading authorities in the area: Thomas Grisso, Marsha Levick, Elizabeth Scott, and Laurence Steinberg.[8] These

---

*Developmental Perspective on the Adjudication of Youthful Offenders*, 6 Va. J. Soc. Pol'y & L. 389, 391 (1999) [hereinafter Steinberg & Cauffman, *Adjudication of Youthful Offenders*].

[8]These experts continue to provide valuable research on the issue of juvenile development and the criminal justice system. *See generally* Thomas Grisso et al., *Juveniles' Competence to Stand Trial: A Comparison of Adolescents' and Adults' Capacities as Trial Defendants*, 27 Law & Hum. Behav. 333 (2003) (evaluating data indicating impairment of judgment and competence in juveniles, affecting legal competence to stand trial); Thomas Grisso & Antoinette Kavanaugh, *Prospects for Developmental Evidence in Juvenile Sentencing Based on* Miller v. Alabama, 22 Psychol., Pub. Pol'y, & L. 235, 240 (2016) (exploring evidentiary considerations regarding the *Miller* developmental factors in new sentencing cases); Marsha Levick & Neha Desai, *Still Waiting: The Elusive Quest to Ensure Juveniles a Constitutional Right to Counsel at All Stages of the Juvenile Court*

four leading authorities on child development and the law state that "[b]ecause the *Miller* factors are based upon developmental constructs, expert assessments by forensic *child clinical psychologist or psychiatrists* are required to inform courts making sentencing decisions." Scott et al., *Juvenile Sentencing Reform*, 88 Temp. L. Rev. at 695 (emphasis added).[9]

Scott and her colleagues further emphasize the importance of *child* development expertise. According to these leading authorities, "[g]eneral forensic mental health professionals who evaluate adults for criminal courts are usually not qualified to undertake these assessments." *Id.*

Yet, that is exactly what occurred in this case. The State's expert was a staff psychiatrist with the department of corrections. She was named as an expert by the State at the last minute in this matter, on

---

*Process*, 60 Rutgers L. Rev. 175 (2007) (arguing that juveniles need counsel at all points in legal proceedings as they generally do not understand their rights or the proceedings well enough to make informed decisions); Elizabeth S. Scott & Laurence Steinberg, *Blaming Youth*, 81 Tex. L. Rev. 799 (2003) (addressing how legal practitioners should think about immaturity as it relates to competence and moral blameworthiness); Elizabeth S. Scott & Thomas Grisso, *Developmental Incompetence, Due Process, and Juvenile Justice Policy*, 83 N.C. L. Rev. 793 (2005) (applying legal trial competence requirements to juveniles and examining the relationship between immaturity and incompetence); Elizabeth S. Scott, *Judgment and Reasoning in Adolescent Decisionmaking*, 37 Vill. L. Rev. 1607 (1992) (exploring existing literature on adolescent decision-making within their capacities as legal actors); Scott et al., *Juvenile Sentencing Reform*, 88 Temple L. Rev. 675 (analyzing the *Miller* framework and how it has been applied by lower courts and states); Elizabeth S. Scott & Laurence Steinberg, *Social Welfare and Fairness in Juvenile Crime Regulation*, 71 La. L. Rev. 35 (2010) (analyzing the juvenile constitutional framework, underlying developmental science, and the principle that "children are different"); Steinberg & Cauffman, *Adjudication of Youthful Offenders*, 6 Va. J. Soc. Pol'y & L. 389 (outlining aspects of adolescent development relevant to legal proceedings); Laurence Steinberg & Elizabeth Cauffman, *Maturity of Judgment in Adolescence: Psychosocial Factors in Adolescent Decision Making*, 20 Law & Hum. Behav. 249 (1996) (canvassing extant scientific literature to create a framework for psychosocial evaluation of capacity for judgment in juveniles).

[9]The American Academy of Child and Adolescent Psychiatry recommends that professionals conducting assessments should have adequate experience, education, and training, including knowledge of normal growth and development and child psychopathology. Louis J. Kraus et al., Am. Acad. Child & Adolescent Psychiatry, *Practice Parameter for Child and Adolescent Forensic Evaluations*, 50 J. Am. Acad. Child & Adolescence Psychiatry 1299, 1304 (2011).

January 30, 2018, conducting Majors' psychiatric evaluation two weeks later on February 13. The resentencing hearing was initially scheduled for February 20 and only later was continued to March 5. She worked primarily with adults and only came in contact with juveniles in the corrections system. There is nothing in the record to establish her qualifications with regard to *child* developmental psychology. Indeed, as will be shown below, the State's expert demonstrated little familiarity with child developmental psychology.

In effect, while the State's expert was testifying at the March 5 hearing, it was in fact the prosecutor testifying through repeated use of leading questions that suggested the answer. By way of example,

> Q. Through your evaluation, as well as a review of the record, you found no psychiatric or mental health illness that would have impacted his ability to understand what he was doing at the time of the crime; correct? A. That's correct.
>
> . . . .
>
> Q. Is it also a concern in terms of rehabilitation if the defendant doesn't take full responsibility for his actions or minimizes his conduct? A. This is kind of where the concern for the treatment kind of comes up in terms of rehabilitation. . . . That's kind of where the rehabilitation is founded upon.
>
> . . . .
>
> Q. Taking that one step further, if one takes a little responsibility but kind of minimizes what he did, it's going to minimize them because they're going to get out or rehabilitation programs; correct? A. Correct.
>
> . . . .
>
> Q. Combined with a lack of empathy for the victims, that doesn't give us a very good forecast for his rehabilitation; would that be fair? A. That would be fair.
>
> . . . .

Q. So in some respects the judicial declaration at 18 is a demarcation point and somewhat of an partial line being drawn; would that be fair? A. That would be fair.

Q. If you're going to draw the line there, then if that's the best way the line gets drawn, then what you're saying is the development that this defendant would have had in the 15 days from commission of crime until he reached age of majority would have been minimal, if any; correct? A. That's correct.

Q. So in terms of mitigating his responsibility for the crime, at best it would have minimal mitigating value; would that be fair? A. Yes.

While Majors' counsel inexplicably did not object to the expert's qualifications or to her testimony, the testimony of the State's expert is entitled to little or no weight by the court. The repeatedly leading nature of the questioning undermines any credibility in the testimony. *See Denniston Partridge Co. v. Romp*, 244 Iowa 204, 210, 56 N.W.2d 601, 604 (1953) ("While the absence of proper objection left the answers in the record for what they were worth, we think the weight of such testimony is very slight."). Further, the lack of qualifications in child developmental psychology undermines her testimony. *State ex rel. Leas in re O'Neal*, 303 N.W.2d 414, 421 (Iowa 1981) ("[I]t is not sufficient that the expert be generally qualified in the area of inquiry; 'sufficient data must appear upon which an expert judgment can be made (on the specific question propounded,) and if absent, the opinion is incompetent.' " (quoting *Holmquist v. Volkswagen of Am., Inc.*, 261 N.W.2d 516, 524 (Iowa Ct. App. 1977))).

We have emphasized that "[p]erceptions applicable to adult behavior cannot normally be used to draw conclusions from juvenile behavior." *Roby*, 897 N.W.2d at 147; *see also* Jenny E. Carroll, *Brain Science and the Theory of Juvenile* Mens Rea, 94 N.C. L. Rev. 539, 598 (2016) ("I am not asserting either that adolescent offenders are categorically incapable of

achieving any particular mens rea or should be rendered blameless by their immaturity. Quite the contrary—I am arguing that, like all offenders, adolescents should be held accountable for the mens rea they *actually* achieved."); Marsha Levick et al., *The Eighth Amendment Evolves: Defining Cruel and Unusual Punishment Through the Lens of Childhood and Adolescence*, 15 U. Pa. J.L. & Soc. Change 285, 293 (2012) ("Emerging research in [the field of developmental psychology] indicates that developmental immaturity consists of four components distinguishing adolescents from adults: independent functioning, decision-making, emotion regulation, and general cognitive processing."). But by using a psychiatrist with no demonstrable child development training and whose clinical experience was largely with adults, the State's presentation was more akin to a sentencing process that might be appropriate for an adult but assuredly was inappropriate for a juvenile. This is evidenced by a number of specific errors and omissions in the expert testimony, which was erroneously relied upon in the district court's ruling.

**B. "First and Foremost": Direction Regarding Consideration of the Mitigating Factors of Youth.** *Lyle* states in clear language, "*First and foremost,* the time when a seventeen-year-old could seriously be considered to have adult-like culpability has passed." 854 N.W.2d at 398 (emphasis added). The first-and-foremost principle is entirely absent from the testimony of the expert and from the district court's opinion. First and foremost, lessened culpability for all juveniles under eighteen is the norm, not the exception. First and foremost, because "children are constitutionally different than adults," they ordinarily cannot be held to the same standard of culpability as adults in criminal sentencing. *Miller*, 567 U.S. at 470–72, 132 S. Ct. at 2464–65. First and foremost, the default rule is that children are not subject to mandatory minimums of

incarceration. *Roby*, 897 N.W.2d at 144 (citing *Null,* 836 N.W.2d at 74). First and foremost, "[m]itigation normally is warranted in all crimes." *Id.* at 146.

As noted by Scott and her colleagues, "[g]iven the background principle embraced by the [United States] Supreme Court that most youths are immature, the prosecutor carries a substantial burden." Scott et al., *Juvenile Sentencing Reform,* 88 Temp. L. Rev. at 696. According to Scott and Steinberg, "a strong presumption that mitigation applies categorically to the juvenile offenders avoids innocent errors and more pernicious influences that may distort individualized determinations." Elizabeth S. Scott & Laurence Steinberg, *Rethinking Juvenile Justice* 141 (2008) [hereinafter Scott & Steinberg, *Rethinking Juvenile Justice*].

*Roby* embraces these principles. Under *Roby*, expert testimony may be used to show that the normative mitigation principle does not apply by showing that the particular juvenile offender "possessed features of maturity beyond his or her years." 897 N.W.2d at 146. The State has the burden of showing the unusual or exceptional maturity, the prerequisite showing for departure from child developmental norms. The State must show that the juvenile's maturity is so exceptional and so outside the norm that an adult mandatory sentence is appropriate.

The State's expert testified that she "found nothing about Majors' age at the time of the offense that mitigated against a mandatory sentence." But that is not the child development framework presented in *Roby*. Under the *Roby* framework, juveniles under eighteen are less culpable than adults unless expert testimony shows maturity beyond his or her years. *Id.* at 146. The record should not be viewed through the lens ordinarily applied to adult behavior, but through the lens of child developmental psychology principles. *Id.* at 147.

No such expert testimony was offered in this case. Instead, the State's expert, through highly leading questions, flipped the *Roby* framework on its head, put the burden of mitigation based on age on Majors, and then declared that she had found nothing to establish mitigation. She ignored, or more likely given her lack of qualifications was unaware of, the normative developmental principle that teenagers, including those that are seventeen years of age, are categorically less culpable than adults absent expert testimony that the offender "possessed features of maturity beyond his or her years." *Id.* She occasionally cited facts in the record germane to child development, but these facts were not analyzed through the lens of child developmental psychology as required by our caselaw.

Although not explicit, the district court ruling in this case appears to have flipped the burden as well. It certainly does not start from the general presumption of mitigation for seventeen-year-olds. Indeed, in key passages, it reads very much like an ordinary adult sentencing order. If the district court had operated from the assumption that "[f]irst and foremost, the time when a seventeen-year-old could seriously be considered to have adult-like culpability has passed" and the "children are different" framework, the numerous and repeated shortcomings in the State's expert testimony would have been viewed as problematic. *Lyle*, 854 N.W.2d at 398; *see Miller*, 567 U.S. at 470–72, 132 S. Ct. at 2464–65. A clear example of the district court's endorsement of legal error arising from expert testimony is presented in the erroneous treatment of a seventeen-year-old as nearly an adult contrary to established caselaw. Even if it is unclear that the district court applied the wrong legal standard, reversal and remand is appropriate to clarify the basis of the court's ruling. *See State v. Showens*, 845 N.W.2d 436, 449–50 (Iowa 2014)

(finding reversal and remand proper where unsure whether the district court applied correct legal standard).

**C. Erroneous Treatment of Seventeen-Year-Old as Nearly an Adult Contrary to Established Caselaw.**

1. *Introduction.* The State's expert and the district court erroneously analyzed the impact of Majors' age. They emphasized that Majors' offense occurred fifteen days before he turned eighteen and then suggested that the proper analytical approach was to determine whether fifteen days of additional life would have had any impact on Majors' decision-making.

2. *Contrary to principles of child developmental psychology.* This bizarre analytical framework is completely inconsistent with the principles of child developmental psychology that underlie *Miller*, *Graham*, and *Roper* and *Roby*, *Seats*, *Lyle*, and *Null*. The line for the presumption of lessened culpability has been placed at eighteen years of age, many years inside the scientific boundaries of the developing child. As noted by the Supreme Court, the age of eighteen comes from history and social meaning of age, but not from developmental psychology. *Roper*, 543 U.S. at 569, 125 S. Ct. at 1195. This presumption exists in part because the law assumes that a person eighteen years of age has the freedom to extricate themselves from unfavorable social environments and in part because society generally accepts eighteen as a threshold separating children from adults for a wide variety of activities. *Id.* But with respect to persons under the age of eighteen, "the presumption of immaturity can be applied confidently to most persons in the group." Scott & Steinberg, *Rethinking Juvenile Justice* at 140.

It is simply wrong and completely inconsistent with developmental psychology, however, to conclude that a seventeen-year-old is almost

eighteen and therefore not entitled to the presumption of immaturity. It is well established that a lot of relevant social and emotional development related to culpability occurs in juveniles after the age of eighteen and through the mid-twenties.[10] According to two leading scholars in adolescent development and the law, Scott and Steinberg, "[t]he research clarifies that substantial psychological maturation takes place in the middle of late adolescence and even into early adulthood." *Id.* at 60. Thus, Scott and Steinberg emphasize that "adolescents, even at age sixteen and seventeen, are immature in their psychosocial and emotional development, and this likely affects their decisions about involvement in crime in ways that distinguish them from adults." *Id.* at 131. Recently, Steinberg and his colleagues stated,

> Over the past decade, developmental psychologists and neuroscientists have found that biological and psychological development continues into the early twenties, well beyond

---

[10]The leading exploration of developmental psychology for "emerging adults" is Jeffrey Jensen Arnett, *Emerging Adulthood: A Theory of Development from the Late Teens Through the Twenties*, 55 *Am. Psychologist* 496 (2000). The article broadly examines the subjective and objective differences of individuals between eighteen and twenty-five, as compared to adolescents and youth adults. *See also* Elizabeth Cauffman & Laurence Steinberg, *(Im)maturity of Judgment in Adolescence: Why Adolescents May Be Less Culpable than Adults*, 18 Behav. Sci. & L. 741, 758 (2000) ("The present study indicates that . . . psychosocial characteristics continue to develop during late adolescence, and that these changes result in significant declines in antisocial decision-making . . . [which] are *appreciable* enough to warrant drawing a legal distinction."). The last twenty years of research have supported Arnett's view that the brains of teens continue to evolve until the mid-twenties. *See, e.g.*, Alexandra O. Cohen et al., *When Is an Adolescent an Adult?: Assessing Cognitive Control in Emotional and Nonemotional Contexts*, 27 Psychol. Sci. 549, 559–60 (2016) (suggesting young adults have lower cognitive capacity in emotional situations when compared to adults); Josh Gupta-Kagan, *The Intersection Between Young Adult Sentencing and Mass Incarceration*, 2018 Wis. L. Rev. 669 (2018) (canvassing both the scientific literature about young adult development and examining it in light of sentencing and mass incarceration); Elizabeth S. Scott et al., *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641 (2016) (examining the neuroscientific, psychological, and sociological research on young adulthood as applied in a criminal justice context); Kelsey B. Shust, Comment, *Extending Sentencing Mitigation for Deserving Young Adults*, 104 J. Crim. L. & Criminology 667, 684–89 (2014) (exploring broadly the legal relationship between youthfulness and culpability).

the age of majority. Recently, researchers have found that eighteen- to twenty-one-year-old adults are more like younger adolescents than older adults in their impulsivity under conditions of emotional arousal.

Elizabeth S. Scott et al., *Young Adult as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641, 642 (2016) [hereinafter Scott et al., *Transitional Legal Category*].

3. *Contrary to caselaw.* The caselaw does not support the just-short-of-eighteen analysis of the State's expert that was erroneously adopted by the district court. In *Roper*, the Supreme Court made no mention of the just-short-of-eighteen argument even though *Roper* was just a few months shy of his eighteenth birthday when he committed a brutal murder. *See Roper*, 543 U.S. at 619, 125 S. Ct. at 1223. Nothing in United States Supreme Court caselaw suggests that a just-short-of-eighteen analysis is appropriate in considering the culpability of youth in the application of cruel and unusual punishment concepts.

Our Iowa caselaw is clear on this point. In *Null*, for instance, we cited Steinberg and others for the proposition that "identity development, which is often accompanied by experimentation with risky, illegal, or dangerous activities, occurs in late adolescence and early adulthood." 836 N.W.2d at 55 (citing Scott & Steinberg, *Rethinking Juvenile Justice* at 50–52). We further noted that "[t]he research clarifies that substantial psychological maturation takes place in middle and late adolescence and even into early adulthood." *Id.* (quoting Scott & Steinberg, *Rethinking Juvenile Justice* at 60).

Then in *Lyle*, the district court sentenced a seventeen-year-old to an adult mandatory minimum for the crime of second-degree robbery. 854 N.W.2d at 380. We vacated the sentence and remanded the case for an individualized hearing on whether the adult mandatory sentence could be

imposed on Lyle. *Id.* at 404. In *Lyle*, we cited *Graham* for the proposition that persons under eighteen had "categorically diminished culpability." *Id.* at 398 (citing *Graham*, 560 U.S. at 71–75, 130 S. Ct. at 2028–30).

We again returned to the subject in *Seats*, where we considered a sentencing proceeding involving a seventeen-year-old offender convicted of first-degree murder and first-degree burglary. 865 N.W.2d at 549. In sentencing Seats to life in prison without parole, the district court emphasized that Seats was a seventeen-year-old, thereby raising the "almost eighteen" argument. *Id.* at 556–57.

In response, we stated that we recognized that "in *Roper*, the line between being a juvenile and an adult was drawn for cruel and unusual punishment purposes at eighteen years of age." *Id.* at 556–57 (citing *Roper*, 543 U.S. at 574, 125 S. Ct. at 1197–98). Yet, we cited *Null* for the proposition that current science demonstrated that the brain continued to develop into the early twenties. *Id.* at 557 (citing *Null*, 836 N.W.2d at 55). We repeated the findings of Scott and Steinberg that "adolescents, even at the age sixteen and seventeen, are immature in their psychosocial and emotional development, and this likely affects their decisions about involvement in crime that distinguishes them from adults." *Id.* at 557 (quoting Scott & Steinberg, *Rethinking Juvenile Justice* at 131). Then we declared, "*In light of the science, the fact that a defendant is nearing the age of eighteen does not undermine the teachings of* Miller *and* Null." *Id.* (emphasis added).

Finally, in *Roby*, the defendant was sixteen and seventeen years old when he committed the crimes of sexual abuse in the second and third degrees. We again cited the work of developmental psychologists for the proposition that "developmental changes . . . continue into the mid-twenties." *Roby*, 897 N.W.2d at 145 (quoting Scott et al., *Transitional Legal*

*Category*, 85 Fordham L. Rev. at 647). We declared that "age is not a sliding scale that necessarily weighs against mitigation the closer the offender is to turning eighteen years old at the time of the crime." *Id.* But that, of course, is exactly what the State's expert did, and the approach the district court uncritically adopted.

In a footnote, the majority cites Steinberg for the proposition that *cognitive* development of sixteen-year-olds is often fully developed. *See* Laurence Steinberg et al., *Are Adolescents Less Mature than Adults? Minors' Access to Abortion, the Juvenile Death Penalty, and the Alleged APA "Flip-Flop,"* 64 Am. Psychologist 583, 586–87 (2009) ("Studies that have examined logical reasoning abilities in structured situations and basic information processing skills, for instance, find no appreciable differences between adolescents age 16 and older and adults[.]"). But the majority is apparently unaware that Steinberg, consistent with the consensus social science, emphasizes that *psychosocial* and *emotional development* continues into the mid-twenties and that this delay in development impacts criminal culpability. *See* Scott & Steinberg, *Rethinking Juvenile Justice* at 60; *see also* Scott et al., *Transitional Legal Category*, 85 Fordham L. Rev. at 647 ("[B]ecause development of brain systems that regulate impulse control is more protracted, continuing into the early twenties, a period of vulnerability to risky behavior results . . . [and may be likened to an] 'accelerator' [being] pressed to the floor, [while] a good 'braking system' is not yet in place." (Footnote omitted.)). Further, the majority fails to recognize that our caselaw, and that of the United State Supreme Court, embraces the work of Steinberg and his colleagues for precisely the opposite proposition advanced by the majority and supported by the footnote. *See Roper*, 543 U.S. at 570, 125 S. Ct. at 1196; *Seats*, 865 N.W.2d at 557. Finally, the majority fails to tell the reader that *Roby*,

*Seats*, *Lyle*, and *Null* stand for the proposition that even those approaching eighteen years of age as a general rule have diminished culpability.

In the end, the district court was misled by an unqualified expert. "Forensic professionals conducting assessments for a sentencing hearing must be sure to keep up with relevant post-*Miller* legislation and case law in the jurisdiction where the hearing is taking place." Kimberly Larson et al., Miller v. Alabama: *Implications for the Forensic Mental Health Assessment at the Intersection for Social Science and the Law*, 39 New Eng. J. on Crim. & Civ. Confinement 319, 330 n.60 (2013) [hereinafter Larson et al., *Mental Health Assessments*]. As a nonlawyer medical professional with very limited professional interaction with juveniles who was designated at the last minute to testify as an expert for the first time in a sentencing hearing involving a juvenile offender, the State's expert, perhaps, can be forgiven for her lack of knowledge about child and young adult developmental psychology and the applicable caselaw. She simply was clueless when the prosecutor asked her leading questions that led the expert to testify in a manner contrary to applicable Iowa Supreme Court precedent and in total disregard of the findings of child developmental psychology.

The district court expressly embraced the "almost eighteen" reasoning of the State's expert in considering age, which it characterized as "the most important factor" under our decisions. Through the use of the "almost eighteen" framework, the district court, like the State's expert, eviscerated the importance of age by essentially treating Majors as an adult. When a district court unlawfully considers a factor in making a decision, an abuse of discretion is present. *State v. Zarate*, 908 N.W.2d 831, 856 (Iowa 2018) (" '[I]f a sentencing court fails to consider a relevant factor that should have received significant weight, gives significant weight

to an improper or irrelevant factor, or considers only appropriate factors but nevertheless commits a clear error of judgment' a discretionary sentencing ruling may be an abuse of discretion." (quoting *Roby*, 897 N.W.2d at 138)); *State v. Knight*, 701 N.W.2d 83, 85 (Iowa 2005) ("[T]he use of an impermissible sentencing factor is an abuse of discretion and requires resentencing.").

**D. Failure to Conduct Meaningful Evaluation.** In order to overcome the presumption of diminished culpability for youth, the State must ordinarily present a meaningful professional evaluation of the defendant. Consistent with principles of child developmental psychology, we have taken a broad approach to environmental factors, including such things as parental neglect, drug or alcohol use, prior exposure to violence, and age-related susceptibility to psychological or emotional damage. *Seats*, 865 N.W.2d at 556. In conducting a forensic evaluation of a juvenile offender, Scott and her colleagues declare that the child development expert evaluating the culpability of juvenile defendants must engage in "skilled interviewing of the youth, and of family members, teachers, and peers who have observed the youth's functioning." Scott et al., *Juvenile Sentencing Reform*, 88 Temp. L. Rev. at 697. This should be done in light of "a comprehensive review of records of the youth's past behavior in various social situations (e.g. school, rehabilitation settings)." *Id.*

Instead, the State's expert selectively gathered documents available at the department of corrections and in the court file. She assiduously gathered documents regarding each and every discipline violation. But contrary to the child developmental psychology authorities, she did not thoroughly interview the parents. Contrary to the child development authorities, she did not thoroughly interview teachers. Contrary to the child development authorities, she did not thoroughly interview Majors'

peers. She appears to have thoroughly gathered information that might reflect adversely on Majors but did not engage in the kind of thorough exploration that is required for meaningful evaluation according to Scott and her colleagues.

I suppose one might argue that the thorough investigation demanded by Scott and her colleagues would be inefficient and yield very little. The State has limited resources, so the argument goes, and cannot be expected to reach out beyond the department of corrections and the court system in the gathering of materials for the evaluation of a juvenile offender facing an adult mandatory minimum sentence. But that just is not the way things are done, right? Can't we simply follow our gut instincts, with a limited factual review?

No! Put simply, the law requires more. The State has the burden of showing that a juvenile offender is an exceptional person that falls outside ordinary norms that mitigate culpability. This burden is very difficult to meet without a thorough investigation of the family and social background of a juvenile offender, as demanded by Scott and her colleagues.

Since circumstances vary from individual to individual, it is difficult to draw a line in the sand to say that a particular review is sufficient or not. At some point the investigation supporting an evaluation must come to an end, and at some juncture there are diminishing returns. There is, for instance, no requirement that an expert interview all family members, every teacher, and every peer. But what is required is that a reasonable review be conducted. That did not occur in this case.

The record shows that Majors was abused by his father up until sixth grade. Certainly this is a fact that any child developmental psychologist would want to explore and develop. *See, e.g.*, Samantha Buckingham, *Reducing Incarceration for Youthful Offenders with a*

*Developmental Approach to Sentencing*, 46 Loy. L.A. L. Rev. 801, 850 (2013) (noting the limitations of developmental science and generalizations because of varying experiences in individuals due to their sociological backgrounds, including exposure to abuse, trauma, or neglect); David Dante Troutt, *Trapped in Tragedies: Childhood Trauma, Spatial Inequality, and Law*, 101 Marq. L. Rev. 601, 626 (2018) ("As children's brains react to traumatic stressors, processes are trigged that affect different systems in the body . . . rang[ing] from behavioral self-regulation problems and mental illness . . . [to] risk of alcohol or substance abuse . . . ." (Footnotes omitted.)). *See generally* Jennifer E. Lansford et al., *Early Physical Abuse and Later Violent Delinquency: A Prospective Longitudinal Study*, 12 Child Maltreatment 233 (2007) (citing the link between early physical abuse and later aggression and delinquency and other social and psychological problems, including depression and anxiety). The State's expert in Majors' case made no such effort.

The record also shows that Majors transferred out of the Bedford Public Schools and enrolled in an alternative school at age fifteen. Something substantial is going on here. Any child developmental mental health professional would thoroughly review the attendant circumstances to figure out what was going on. *See, e.g.*, Substance Abuse & Mental Health Servs. Admin., U.S. Dep't of Health & Hum. Servs., *Screening and Assessment of Adolescents in Juvenile Justice Setting, in Screening and Assessing Adolescents for Substance Use Disorders, Treatment Improvement Protocol (TIP) Series* 45 (2012) (noting that screening and assessing adolescents in a juvenile justice setting is a complex task and the evaluator must be alert to the comorbidities a juvenile experiencing substance abuse may encounter, such as poor school performance). Yet,

the State's expert made no serious effort to understand what was going on here.

And this isn't the only issue of concern that the expert did not properly consider. Majors suffered from scoliosis, or curvature of the spine. It was apparently serious enough to require surgical intervention and the placement of rods in his back at the age of twelve. Later, he had to wear a brace of some kind. Although Majors was inclined to athletics, he could no longer engage in contact sports in small town Iowa middle and high schools. What was the impact of this development? Did it contribute to feelings of anger and loneliness? *See* Ryszard Tomaszewski & Magdalena Janowska, *Psychological Aspects of Scoliosis Treatment in Children, in Recent Advances in Scoliosis* 301, 301–03 (Theodoros Grivas ed., 2012) (noting the effects of scoliosis compound on existing challenges of adolescence, creating altered perceptions of body image, anger, embarrassment, and impairment of social functioning); Despina Sapountzi-Krepia et al., *The Experience of Brace Treatment in Children/Adolescents with Scoliosis*, 1 Scoliosis art. 8 (2006) (noting that scoliosis can be a risk factor for psychological impairment in children and adolescents, particularly in those undergoing brace treatment). How did this affect Majors? The expert gives us no insight.

The record further indicates that as a child, Majors was mocked by his peers because his family raised chickens in the country. According to his discharge summary from Oakdale in 2003, Majors "seem[ed] to be an angry individual who tend[ed] to ruminate on being ridiculed by other children in the past and tend[ed] to lose his temper when things [did] not go his way." A nurse additionally noted that Majors "appear[ed] to have many years of anger bottled up from teasing and abuse from peers." He was "tearful" when describing past experience of abuse and teasing, and

his file notes Majors was "very immature (emotionally) and doesn't cope well with stress or problems." The file suggests that Majors "might benefit from therapy targeting interpersonal relationships, difficulties, and anger." These are the kinds of things that would interest a child developmental psychologist or psychiatrist. *See* Anat Brunstein-Klomek et al., *Bullying, Depression, and Suicidality in Adolescents*, 46 J. Am. Acad. Child & Adolescent Psychiatry 40, 40–41 (2007) (noting that studies examining the relationship between bullying, and depression and suicidality, found victims were more likely to manifest more depressive symptoms, psychological distress, and both suicidal ideations and suicide attempts than nonvictims); Nicholas Carlisle & Eric Rofes, *School Bullying: Do Adult Survivors Perceive Long-Term Effects?*, 13 Traumatology 16, 17–18, 23 (2007) (noting studies that determined the common emotional and behavioral responses to bullying are vengefulness, anger, self-pity, anxiety, low self-regard, and school absenteeism and discussing how some symptoms remain even after bullying as stopped, and how anger and vengeful ideation are a long-term effect of survivors of bullying); Calli Tzani-Pepelasi, *Childhood Bullying Can Cause Lifelong Psychological Damage—Here's How to Spot the Signs and Move On*, The Conversation, (last updated August 8, 2018), http://theconversation.com/childhood-bullying-can-cause-lifelong-psychological-damage-heres-how-to-spot-the-signs-and-move-on-100288 [https://perma.cc/JY5C-9976] (discussing studies that outline effects of bullying including self-esteem issues and anger due to repeated victimization). The State's expert drives by these very important developmental clues and finds nothing, individually or cumulatively, in Majors' background to support lessened culpability?

In addition, the State's expert failed to recognize obvious features of the record that show immaturity, such as compromised capacity to

consider future consequences. When Majors was at Oakdale receiving psychiatric treatment, he was preoccupied, if not obsessed, with the notion that he threw his life away. Obviously, Majors came to the view that his risk-taking calculus was unbalanced. One of the trademark features of youth is undervaluing the long-term costs of their behavior to themselves and others. *See* Laurence Steinberg & Elizabeth Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*, 58 Am. Psychologist 1009, 1012 (2003). Majors stewing over his predicament suggests he came to recognize his "transient rashness, proclivity for risk, and inability to assess consequences" that *Miller* finds lessen culpability in juveniles. 567 U.S. at 472, 132 S. Ct. at 2465.

One of the elements of youthful immaturity is the influence of mass media. *See generally* Jeffery Jensen Arnett, *Adolescents' Use of Media for Self-Socialization*, 24 J. Youth & Adolescents 519, 520 (1995) (finding media to be a significant part of adolescents' lives, and the potential of media in socialization of youth "especially strong"); Jonathan Seiden, Comment, *Scream-ing for a Solution: Regulating Hollywood Violence; An Analysis of Legal and Legislative Remedies*, 3 J. Const. L. 1010, 1010 (2001) (analyzing violence in film and the effects of viewing violent films on juveniles). As noted by prestigious authority, the "visible and volatile" influence of media is an important part of the socio-ecology of children and youth. Nat'l Res. Council & Inst. of Med., *Studying Media Effects on Children and Youth* 1 (2006).

Majors is a poster child of the influence of the media. He got the idea of putting a plastic bottle on the end of his rifle to muffle the sound from a Steven Segal movie. Sounds like a pretty immature reaction to me. Copycat behaviors among juveniles who commit violent crime is not

unusual. *See* Ray Surette, *Self-Reported Copycat Crime Among a Population of Serious and Violent Juvenile Offenders*, 48 Crime & Delinquency 46, 62 (2002).

And then there is the issue of adolescent drug use. Generally, adolescent drug usage has been found to be a mitigating factor to be considered in sentencing juvenile offenders. *See, e.g.*, *Seats*, 865 N.W.2d at 556 ("One of the circumstances the sentencing judge needs to consider is whether substance abuse played a role in the juvenile's commission of the crime."). It certainly should have been considered here.

At the time of resentencing, the State's expert diagnosed Majors as having alcohol-use disorder, cannabis-use disorder, and stimulant disorder, specifically methamphetamine, all moderate and in sustained remission. These disorders must have predated his imprisonment and been developed as a juvenile. The record supports such a conclusion of adolescent polysubstance abuse by Majors. Any reasonable exploration of juvenile substance abuse would have yielded important information relevant to Majors' sentence.

The starting point is the accepted definition of substance-use disorder.[11] According to the DSM-5, substance-use disorder is characterized by a "cluster of cognitive, behavioral, and physiological symptoms indicating that the individual continues using the substance despite significant substance related problems." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 483 (5th ed. 2013) [hereinafter DSM-5].

Adolescent substance use is associated with negative health and behavioral outcomes, including alterations in neurodevelopment. *See*

---

[11]Under the DSM-IV framework, which Majors was diagnosed under, the various alcohol- and substance-abuse disorders have been consolidated under the umbrella of substance-use disorder in the DSM-5.

*generally* Reagan Wetherill & Susan F. Tapert, *Adolescent Brain Development, Substance Use, and Psychotherapeutic Change*, 27 Psych. Addictive Behav. 393, 393 (2013) ("Adolescent substance use is associated with negative health, social, and behavioral outcomes, including alterations in neurodevelopment."). Since the brain changes through adolescence, exposure to neurotoxins, such as alcohol and illicit drugs, may interrupt neurodevelopment and associated cognitive and behavioral functioning. *Id.* at 394–96 (explaining the complex neurological pathways that are impacted through behaviors such as drinking and illicit drug use). An important characteristic of substance-use disorder is the "underlying change in brain circuits that may persist beyond detoxification," especially in individuals with severe disorders. DSM-5 at 483.

Adolescent substance use has been linked to issues in interpersonal relationships. Studies report that temperamental and personality traits reflecting "behavioral undercontrol and poor self-regulation are associated with adolescent substance use problems." Laurie Chassin et al., *Adolescent Substance Use, in Handbook of Adolescent Psychology* 676 (Richard M. Lerner & Laurence Steinberg eds., 2d ed. 2004). The personality characteristics most consistently associated with adolescent substance use include "unconventionality, low ego control, sensation seeking, aggression, impulsivity, and an inability to delay gratification." *Id.*

Additionally, adolescents with substance use problems are characterized by

> lower levels of executive functioning—that is, higher order cognitive processes that allows for future goal-oriented behavior. These processes include planning, organizational skills, selective attention, hypothesis generations, cognitive flexibility, maintenance of cognitive-set decision making, judgment, inhibitory control, and self regulation.

*Id.* at 677. Compared to adults, the health and social consequences of substance abuse for adolescents are more serious due to a variety of biological reasons. Garrett O'Connor, *The Psychology of Adolescent Addiction*, 31 Val. U. L. Rev. 701, 701 (1997).

While experimentation with substances occurs for many adolescents, some progress to regular use where the adolescent uses in an attempt to achieve a high or intoxication or they use as a coping mechanism. *Id.* at 707. This may lead to a change in behavior from decreased school or job performance, social isolation, and deceitful patterns of behavior with family and friends to prevent them from learning about the drug use. *Id.* Other behaviors include lying, stealing, and blaming others. *Id.* at 707–08. In the event the adolescent continues using and their use becomes more frequent, more serious problems develop, including progression in severity of delinquent behaviors, an increase in depression, and reduced impulse control. *Id.*

Where other substances, such as alcohol, may require repeated uses and exposure to cause damage to the brain, methamphetamine can induce significant brain death within hours of a single high dose. Mary Holley, *How Reversible Is Methamphetamine-Related Brain Damage?*, 82 N.D. L. Rev. 1135, 1138 (2006). When someone is early in their addiction, the crash from methamphetamine may appear like a "mild depression." *Id.* Continued and habitual use equates to a worse crash that lasts longer, between seven to fourteen days. *Id.* at 1139. Following habitual use, the person may sleep for days, present as irritable, and have physical symptoms, such as headaches, to accompany the psychological. *Id.* Additionally, "[n]early ninety percent of meth addicts experience at least occasional hallucinations while intoxicated." *Id.* at 1141.

Following continued use, someone who is addicted to methamphetamine may "fly into a rage and act aggressively or violently" and may demonstrate "increase[ed] irritability, impatience, and impulsiveness," thereby impairing the user's relationships with those around them. *Id.* at 1140. It may also produce "profound insomnia" in the user, though they are "not distressed by it, [as] he does not feel a need for sleep. He feels highly productive, important, and intelligent. He commonly does not realize he's impatient. Instead, he places the blame on others . . . ." *Id.* at 1139–40.

Not surprisingly, "[methamphetamine] use during adolescence is associated with . . . behavioral problems such as increased anti-social behaviors." Jordan M. Buck & Jessica A. Siegel, *The Effects of Adolescent Methamphetamine Exposure*, 9 Frontiers in Neuroscience 1, 2 (2015). Additionally, in adolescent users, methamphetamine-induced psychological and behavioral alterations appear to remain even after secession of the drug. *Id.*

The State's expert sailed by these substance-abuse issues. Although polysubstance abuse was noted, it was simply not explored. In light of the history of parental abuse, the school transfer issue, the scoliosis, the mockery from childhood peers, the influence of the mass media, the polysubstance abuse, and the pent-up anger in Majors, there was a lot of material for a well-qualified child developmental psychologist or psychiatrist to consider. But the State's expert left these boulders unturned. In light of the gaps, the district court must determine whether the State successfully rebutted the notion that, "first and foremost," a juvenile offender has less culpability than an adult. The professional opinion was not a meaningful evaluation utilizing child developmental psychology. There is no indication that the district court evaluated the

very weak nature of the expert testimony against the "first and foremost" and "children are different" framework. Where it is uncertain whether the correct legal standard has been applied, we may reverse and remand for application of the correct legal standard. *Showens*, 845 N.W.2d at 449.

**E. Flawed Analysis of Ability to Navigate Legal System.** The expert's review of Majors' medical records from 2003, finding that Majors was competent to stand trial and that he was not insane, led the expert to conclude that the *Miller* factor related to the ability of youth to interact with the legal system was not in play. But that reasoning is demonstrably incorrect. If Majors was incompetent or insane, there would be no trial, no conviction, and no sentence. *See State v. Edwards*, 507 N.W.2d 393, 395 (Iowa 1993) ("Constitutionally, defendants may not be tried or convicted while they are incompetent to stand trial or to assist in their defense."); *State v. McMullin*, 421 N.W.2d 517, 518 (Iowa 1988) ("Insanity is an affirmative defense which, if proved, will preclude conviction of a crime."). In other words, if he was insane or incompetent, there would be no need to consider *Miller* factors at all. If you use incompetence to stand trial and insanity as screening tools, you totally eliminate the criterion of difficulties juveniles face in navigating the court system as spelled out by the Supreme Court in *Graham*, and in our caselaw. The analysis offered by the expert is certainly, unquestionably, incorrect as a matter of law.

Indeed, the State's expert did not address the concerns of *Graham*. In *Graham*, the Court noted that youth have a limited understanding of the criminal legal system, "are less likely than adults to work effectively with their lawyers to aid in their defense" due to a lack of trust and more "limited understandings of the criminal justice system and the roles of the institutional actors within it." 560 U.S. at 78, 130 S. Ct. at 2032. When the question is appropriately framed, there is ample reason to believe that

Majors did, in fact, have trouble navigating the legal system, precisely as *Graham* forewarned.

The State's expert clearly did not review the record in this case. If she had, she would have learned that there was ample reason to believe that Majors had trouble dealing appropriately with the legal system. Over the course of the proceedings stemming from these charges, from 2002 to the present, Majors had at least eleven attorneys of record, many of which fairly quickly withdrew. Focusing on the relevant period of 2002–2003, Majors was represented by at least four attorneys. On May 31, 2002, a lawyer was appointed as counsel for Majors. That lawyer withdrew, however, on June 4, at which point a second lawyer appeared. On February 25, 2003, a third lawyer perfected the defendant's appeal, which was handled by the state appellate defender's office. On remand, a fourth lawyer undertook his representation, but withdrew on April 15. The musical chairs with all the lawyers, at the very least, suggests Majors had difficulty getting along with his legal representatives.

Ultimately, Majors agreed to plead guilty to one count of attempted murder with the proviso that no appeal would be taken.[12] He then turned around and filed a notice of appeal, pulling down his plea bargain. He claimed that he did so because his parents and his attorney pressured him to accept the original plea bargain and that his attorney later urged him to appeal. After the appeal was filed, the original plea bargain failed and Majors was back to square one. Eventually, he plead guilty not only to

---

[12]The condition of the plea bargain that no appeal be taken was very important to the State. There was little in the trial information to suggest that Majors attempted to murder anyone. No shots were fired. He hid in a closet, with duct tape, suggesting perhaps a planned kidnapping or sexual assault but something other than attempted murder. Although his rifle was loaded and he had clear shots at the victims, he did not discharge the weapon. In the plea colloquy, Majors generally admitted the facts in the trial information, but examination of the minutes do not clearly establish the basis for attempted murder.

attempted murder, which was the sole crime for which he was convicted in the first plea bargain, but the additional crime of burglary. Because of his on-off-on approach to the plea bargain, Majors ended up with an additional ten years added onto his prison sentence. Inability to navigate the legal system abounds in this example.

The State's expert noted that Majors tried to manipulate the system by feigning psychiatric illness pending disposition of criminal charges. To the extent this is true, such a manipulative maneuver is part of the normal adolescent effort to avoid responsibility but also shows a fundamental misunderstanding of how our legal system works.

Further, as correctly narrated by the State's expert, Majors came up with numerous oddball and inconsistent stories attempting to explain his behavior. No doubt he attempted to manipulate the legal system to lessen his culpability, and those attempts failed. It seems likely that his immaturity led him to make these inconsistent stories and failed efforts to manipulate the legal system. As every parent knows, nonacceptance of blame and inconsistent reporting is a trademark feature of youth called to account for their actions.

Finally, as with the age criterion, the expert shifted the burden of proof on the question of the ability of juvenile defendants to navigate the court system. When asked whether Majors was able to understand the legal proceedings, the expert noted that they "don't have any evidence to the contrary." But evidence to the contrary is exactly what is required to eliminate difficulties in navigating the court system as a mitigating factor when considering imposition of an adult mandatory sentence on a juvenile offender.

The district court did not focus on the potential difficulties Majors had in navigating the legal system. The district court did emphasize that

Majors backed out of a plea agreement, ultimately resulting in an additional ten-year sentence. If this case were to be remanded, the district court would have an opportunity to give the question more careful consideration.

**F. Flawed Approach to Impulsivity.** The State's expert suggested that because Majors engaged in planning for his crime, Majors lacked the impulsivity associated with youth. There is no exact and unique definition of impulsivity, and there is no agreement over its major components. Nour-Mohammad Bakhshani, *Impulsivity: A Predisposition Toward Risky Behaviors*, 3 Int'l J. High Risk Behavs. & Addiction 1, 3 (2014). Impulsivity has sometimes been defined as swift action without forethought or conscious judgment, but also as "behavior without adequate thought" and "the tendency to act with less forethought than do most individuals of equal ability and knowledge." F. Gerard Moeller et al., *Psychiatric Aspects of Impulsivity*, 158 Am. J. of Psychiatry 1783, 1783 (2001).

But under the caselaw, it is clear that the latter two definitions of impulsivity apply when considering the mitigating features of youth. For example, in *Johnson v. Texas*, 509 U.S. 350, 113 S. Ct. 2658 (1993), the Supreme Court considered a case where the nineteen-year-old defendant surveyed the layout of the store prior to a robbery, determined the number of workers present, determined to kill any witnesses to the crime, retrieved a handgun, engaged in robbery, and killed an employee. *Id.* at 353, 113 S. Ct. at 2661. The Court noted that the jury was entitled to consider the mitigating qualities of youth which "often result in impetuous and ill-considered actions and decisions." *Id.* at 367, 113 S. Ct. at 2669. Similarly, in *Roper*, a seventeen-year-old defendant planned to commit a burglary and murder by breaking and entering, tying up a victim, and throwing her from a bridge into the water. 543 U.S. at 556–57, 125 S. Ct.

at 1187–88.  Counsel challenging his sentence called clinical psychologists and other witnesses indicating that the defendant was "very immature," and "very impulsive."  *Id.* at 559, 125 S. Ct. at 1189.  In granting relief, the *Roper* Court cited *Johnson* for the proposition that juveniles engage in "impetuous and ill-considered actions."  *Id.* at 569, 125 S. Ct. at 1195 (quoting *Johnson,* 509 U.S. at 367, 113 S Ct. at 2669).  Likewise, in *Graham,* the juvenile defendant engaged in a crime spree which showed planning, yet the Court again in granting relief cited *Johnson,* noting that the qualities of youth included a tendency to make "impetuous and ill-considered actions and decisions."  560 U.S. at 72, 130 S. Ct. at 2028 (quoting *Johnson,* 509 U.S. at 367, 113 S. Ct. at 2669).

Clearly, under *Johnson, Roper,* and *Graham,* the fact that the underlying crime involved planning does not negate the notion that the signature qualities of youth, including the tendency to make "impetuous and ill-considered decisions," may be considered as a mitigating factor in the sentencing of a juvenile offender.  And, as noted by *Roby,* "[t]he aggravating circumstances of a crime that suggest that an adult offender is depraved may only reveal a juvenile offender to be wildly immature and impetuous."  897 N.W.2d at 146.  The fact that juveniles have the ability to plan a crime does not negate the proposition that "children are different" or the application of *Roper-Graham-Miller* principles.  To the extent the district court relied on "planning of the crime" as preventing application of the mitigating features of youth, it applied the wrong legal standard.

**G.  Treatment of Rehabilitation.**  Developmental psychology tells us two things about the prospects for the rehabilitation of juveniles and our ability to predict which offenders will commit violence in the future. First, rehabilitation is the norm for juvenile offenders, even when they commit heinous crimes.  The origins of the juvenile justice system are

rooted in the idea of more rehabilitation for youthful offenders than their adult counterparts. *See Lyle*, 854 N.W.2d at 390–92 (summarizing the social science and caselaw underlying the rehabilitative purposes inherent in juvenile justice); Comm. on Assessing Juvenile Justice Reform, Nat'l Acad. of Scis., *Reforming Juvenile Justice* 1–4, 31–49 (2013) [hereinafter Nat'l Acad. of Scis., *Reforming Juvenile Justice*] (outlining the penological differences in dealing with juvenile and adult offenders); Martin Gardner, *Youthful Offenders and the Eighth Amendment Right to Rehabilitation: Limitations on the Punishment of Juveniles*, 83 Tenn. L. Rev. 455, 471–74 (2016) (expounding on the rehabilitative origins of the juvenile justice framework); Kathryn Monahan et al., *Juvenile Justice Policy and Practice: A Developmental Perspective*, 44 Crime & Just. 577, 577 (2015) [hereinafter Monahan et al., *A Developmental Perspective*] ("The early juvenile court viewed and treated juveniles as distinct from adults, with a greater focus on rehabilitation as opposed to punishment for youthful criminal behavior.").

In fact, a developmental approach recognizes that the illegal behavior occurred during a period of development when youth are more likely to exercise poor judgment and engage in risky behavior in pursuit of thrills and excitement. Nat'l Acad. of Scis., *Reforming Juvenile Justice* at 20 ("A developmental approach to juvenile justice recognizes that illegal acts committed by adolescents occur in the context of a distinct period of human development, a time of life when individuals are more likely to exercise poor judgment, take risks, and pursue thrills and excitement."). Research reinforces that juveniles are different from adults in their cognitive processing and development, making them categorically different. *Id.* at 32 ("[A] growing body of research [over the last decade] on adolescent development, particularly brain development . . . reinforces the

conventional wisdom that adolescents *are* different from adults in ways that affect their criminal conduct, and it has probably contributed to the reemergence of less punitive attitudes toward juvenile offenders."). While the pendulum has swung between orientations of punishment versus rehabilitation, it has shifted back through the use of developmental sciences. Monahan et al., *A Developmental Perspective*, 44 Crime & Just. at 578 (noting that declining crime rates, increasing support for rehabilitative penological approaches, and advancing scientific understanding of developmental science contribute to this shift). This was best captured in *Roper*, where the Court recognized the "diminished culpability of juveniles" and their greater capacity for rehabilitation due to their "transient immaturity." 543 U.S. at 571, 573, 125 S. Ct. at 1196–97. This principle was applied in subsequent cases regarding juvenile culpability in both the United States Supreme Court and this court. *See Miller*, 567 U.S. at 471, 132 S. Ct. at 2464; *Graham*, 560 U.S. at 68, 130 S. Ct. at 2026; *Lyle*, 854 N.W.2d at 392.

Second, while some offenders may well reoffend in the future, it is extremely difficult, if not impossible, to make predictions of future dangerousness. *See, e.g.*, Erica Beecher-Monas, *The Epistemology of Prediction: Future Dangerousness Testimony and Intellectual Due Process*, 60 Wash. & Lee L. Rev. 353, 362–63 (2003) (suggesting that clinical predictions about future dangerousness are too unreliable for use in court); Adam Lamparello, *Using Cognitive Neuroscience to Predict Future Dangerousness*, 42 Colum. Hum. Rts. L. Rev. 481, 488 (2011) ("[T]he courts—and commentators—have consistently recognized that predictive adjudications, whether it be for future dangerousness or lack of control, are often unreliable or . . . simply inaccurate."). In fact, the likelihood of a juvenile offender become a chronic adult criminal is small. Alex R.

Piquero, *Youth Matters: The Meaning of* Miller *for Theory, Research, and Policy Regarding Developmental/Life-Course Criminology*, 39 New Eng. J. on Crim. & Civ. Confinement 347, 353 (2013) [hereinafter Piquero, *Youth Matters*] ("Only a very small number of persons continue to offend into and throughout adulthood . . . .").

Rates of all kinds of crimes committed by juveniles decrease precipitously with age, a phenomenon referred to as the "age-crime curve." Laurence Steinberg, *The Influence of Neuroscience on US Supreme Court Decisions About Adolescents' Criminal Culpability*, 14 Nature Reviews Neuroscience 513, 515 & fig. 1 (2013) (illustrating "a consistent relationship between age and crime" across offenses and despite changes in the overall crime rate); *see also* Alex R. Piquero et al., *Violence in Criminal Careers: A Review of the Literature from a Developmental Life-Course Perspective*, 17 Aggression & Violent Behav. 171, 172 (2012) (examining theoretical frameworks for longitudinal offending patterns). Further, across many studies, it appears that even for violent offenders, "the likelihood of repeating [violence] is very rare." Piquero, *Youth Matters*, 39 New Eng. J. on Crim. & Civ. Confinement at 356. These difficulties are even more present when juvenile offenders are involved. *See Roper*, 543 U.S. at 573, 125 S. Ct. at 1197 ("It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption."); Larson et al., *Mental Health Assessments*, 39 New Eng. J. on Crim. & Civ. Confinement at 335–36 ("[T]here is currently no basis in current behavioral science nor well-informed professional knowledge that can support any reliable forensic expert opinion on the relative likelihood of a specific adolescent's prospects for rehabilitation at a date that may be years to decades in the future.");

Piquero, *Youth Matters*, 39 New Eng. J. on Crim. & Civ. Confinement at 355 ("[I]t is very difficult to predict early in the life-course which individual juvenile offender will go on to become a recidivistic adult offender."); Scott et al., *Juvenile Sentencing Reform*, 88 Temp. L. Rev. at 684 ("[P]rediction of future violence from adolescent criminal behavior, even serious criminal behavior, is unreliable and prone to error.").

In *Roby*, we stated that rehabilitation was a factor that supports mitigation for most juvenile offenders because "delinquency is normally transient." 897 N.W.2d at 147. We emphasized that "judges cannot necessarily use the seriousness of a criminal act, such as murder, to conclude the juvenile falls within the minority of juveniles who will be future offenders or are not amenable to reform." *Id.* After all, "the signature qualities of youth are transient." *Lyle*, 854 N.W.2d at 394 (quoting *Roper*, 543 U.S. at 570, 125 S. Ct. at 1196). We have further concluded, however, that in the resentencing of juveniles, current evidence regarding rehabilitation is admissible. *State v. Ragland*, 836 N.W.2d 107, 121–22 (Iowa 2013) (finding that individualized sentencing considerations, including demonstrated maturity and rehabilitation, must necessarily be meaningfully considered in juvenile sentencing).

While rehabilitation is thus the norm, it is extremely difficult to predict future dangerousness of adults and even harder with respect to juveniles. The inability to identify irreparably corrupt juveniles led the United States Supreme Court to categorical rules in *Graham* and *Roper*.

Here, Majors has been incarcerated for most of his prison stay in a maximum security prison. Because of the shortage of available programing and the length of his sentence, he has been waitlisted for victim-impact programming. Juveniles serving lengthy sentences are often disadvantaged in prison by lack of services to meet their

developmental needs. Some prisons can be "complicit in the lack of development" because "it is the policy in some prisons to withhold counseling, education, and rehabilitation programs for those who are ineligible for parole consideration." *Graham*, 560 U.S. at 79, 130 S. Ct. at 2032–33. Majors is no exception.

Majors had a lengthy disciplinary record while in prison related to drug offenses and other nonviolent offenses. In 2014, six of Majors' eight offenses were drug or alcohol related; in 2013 all four of his offenses were drug or alcohol related. In 2012, four out of ten were drug or alcohol related; in 2010 he had one offense for not wearing his identification; and a few years he had some verbal or possession related offenses. Research suggests that there are many causes of prison disciplinary problems. *See generally* David DeMatteo et al., *The Use of Measures of Psychopathy in Violence Risk Assessment, in Handbook of Violence Risk Assessment* 19–40 (Randy S. Otto & Kevin S. Douglas eds., 2010). Additionally, studies show age, education, and social supports can contribute to misconduct. Alan J. Drury & Matt DeLisi, *The Past Is Prologue: Prior Adjustment to Prison and Institutional Misconduct*, 90 Prison J. 331, 333 (2010) (noting studies that indicate "inmates who are younger, male, less educated, lack a social support network . . . and/or have a history of violent behavior engage in significantly higher levels of misconduct in prison than inmates not possessing these characteristics").

A lengthy prison sentence gives little hope and little incentive to reform; but once it became possible that he might be able to challenge the mandatory minimum sentence, Majors' behavior, consistent with renewed hope, turned around. Majors now has not had any discipline in the four years prior to the hearing in this case. Even the expert stated that the last four years evinced Majors had "the capacity for change."

In 2013, Judge Ann Power-Forde, sitting as a member of the Grand Chamber of the European Courts of Human Rights, summed up the importance of the prospect of release for someone incarcerated, stating that

> hope is an important and constitutive aspect of the human person. Those who commit the most abhorrent and egregious of acts and who inflict untold suffering upon others, nevertheless retain their fundamental humanity and carry within themselves the capacity to change. Long and deserved though their prison sentences may be, they retain the right to hope that, someday, they may have atoned for the wrongs which they have committed. They ought not to be deprived entirely of such hope. To deny them the experience of hope would be to deny a fundamental aspect of their humanity and, to do that, would be degrading.

Vinter & *Others v. United Kingdom*, [2013] Eur. Ct. H.R. 645 (July 9, 2013), http://www.bailii.org/eu/cases/ECHR/2013/645.html. In *Graham*, the emphasis on rehabilitation was renewed. *See* Chad Flanders, *The Supreme Court and the Rehabilitative Ideal*, 49 Ga. L. Rev. 383, 413 (2015) [hereinafter Flanders, *Rehabilitative Ideal*] ("Indeed, the fact that life in prison without parole foreclosed 'the rehabilitative ideal' (as the Court put it) is central to its holding. . . . [and] is perhaps the *theme* of the opinion . . . ." (Footnote omitted.)). With rehabilitation comes hope. Justice Kennedy stated the proposition succinctly when he wrote that "[l]ife in prison without the possibility of parole gives no chance for fulfillment outside prison walls, no chance for reconciliation with society, [and] no hope." *Graham*, 560 U.S. at 79, 130 S. Ct. at 2032.

Tailoring rehabilitation to the individual can be "both backward-looking and retributive or forward-looking and rehabilitative." Flanders, *Rehabilitative Ideal*, 49 Ga. L. Rev. at 394. The difference, simply defined, is that

> [i]f the judge is looking at details about the offender . . . to find out what he *deserves* as his punishment, then the judge's individualizing is backward-looking: he is trying to fit the offender to the right amount of deserved retributive punishment. . . .
>
> But if the judge is using those same details to determine how much rehabilitation the offender needs—as well as his fitness for rehabilitation—the judge's individualizing is forward-looking.

*Id.*

Further, there appears to be a life cycle of prison disciplinary events for juvenile offenders. During early years of incarceration, juvenile offenders often engage in a higher base rate of misconduct with a reduction as they mature. Larson et al., *Mental Health Assessments*, 39 New Eng. J. on Crim. & Civ. Confinement at 341 ("We know that even chronic and violent juvenile offenders are more likely to desist from such behaviors than continue them into adulthood."). And, it is hardly surprising that Majors, who has a history of untreated polysubstance abuse, has several disciplinary violations related to drug and alcohol abuse in light of the inability of the department of corrections to provide him with substance-abuse programming.

Among other things, the literature establishes that youthful offenders are more likely to be victims of both physical nonsexual and sexual crime and property crime. *Id.* at 337 nn.75–76 (providing statistics on crimes against incarcerated juveniles). Majors was a victim of sexual assault while incarcerated. Such victimization increases the likelihood of disciplinary history.

In any event, on the question of future rehabilitation, predictions are often quite difficult. We should be extremely cautious of unstructured clinical evaluations by a psychologist unfamiliar with the principles of child developmental psychology.

Further, there is the issue of consistency. Judges necessarily make an ad hoc judgment, case by case, but the parole board is in a better position to ensure consistency. While the district court's characterization of the rehabilitation as minimally favorable is, if anything, an understatement, it is unclear whether the district court regarded rehabilitation as the norm under a "first and foremost" and "children are different" framework. As a result, reversal and remand is appropriate. *Showens*, 845 N.W.2d at 449–50.

**H. Lack of Remorse as a Juvenile Trait.** One of the signature features of youth is thoughtlessness toward others. "Adolescents, often thoughtless and impulsive, will perpetrate a crime . . . without considering its impact on others." David E. Arredondo, *Child Development, Children's Mental Health and the Juvenile Justice System: Principles for Effective Decision-Making*, 14 Stan. L. & Pol'y Rev. 13, 21 (2003). Compared to adults, the characteristics underlying remorselessness, such as egocentrism and lack of empathy, do not have the same predictive importance for future behaviors because the traits are so common in adolescent development. Adam Saper, *Juvenile Remorselessness: An Unconstitutional Sentencing Consideration*, 38 N.Y.U. Rev. L. & Soc. Change 99, 137 (2014) [hereinafter Saper, *Juvenile Remorselessness*] ("Sociological pressures limit a youth's expression of remorse . . . [and] these expressions are hindered by developmental limitations ranging from an inability to fully appreciate the sensation of remorse, to inadvertent pain avoidance techniques that result in the suppression of otherwise existing emotions.").

And, as noted in *Graham*, "[t]he juvenile should not be deprived of the opportunity to achieve maturity of judgment and self-recognition of human worth and potential. . . . Maturity can lead to that considered

reflection which is the foundation for *remorse,* renewal, and rehabilitation." 560 U.S. at 79, 130 S. Ct. at 2032 (emphasis added). And in the words of *Roper,* youth have an "underdeveloped sense of responsibility." 543 U.S. at 569, 125 S. Ct. at 1195. In other words, seen through the lens of child development as applied in *Graham* and *Roper,* a juvenile's lack of remorse is not the equivalent of a lack of remorse in fully developed adults. It is part of youthful immaturity, and therefore a mitigating factor, not an aggravating factor, in sentencing.

Further, even to the extent relevant, remorselessness cannot be assessed in a clinical interview. Indeed, as a youth, the record reveals that Majors had trouble communicating in group, tended to keep to himself, and not volunteer. According to the DSM-5, psychologists should only conclude that an individual lacks remorse by looking at

> multiple information sources. . . . In addition to the individual's self-report, it is necessary to consider reports by others who have known the individual for extended periods of time [and across relationships and settings] (e.g., parents, teachers, co-workers, extended family members, peers).

DSM-5 at 470. No evidence in this case was offered to comply with the DSM-5 requirement.

At the most recent hearing, Majors, now in his mid-thirties, apologized to the victims. He asked the court for permission to address them, but that was denied. Majors proceeded to take full responsibility for his actions and apologized, saying "I would just like to apologize. I couldn't imagine anybody running into my house and pointing a gun at my mom, couldn't imagine what the Peckhams went through. I'm sorry for it."

In short, lack of remorse is a transient juvenile trait that is often ameliorated as the juvenile matures. Those in charge of sentencing must not apply adult standards of remorse to juveniles; if they do, they fail to

recognize that children are different from adults in terms of their emotional and social development. *See* Stephanos Bibas & Richard A. Bierschbach, *Integrating Remorse and Apology into Criminal Procedure*, 114 Yale L.J. 85, 94 (2004) ("Seemingly remorseless acts by children or adolescents can affect whether they are tried as juveniles or as adults."); Kristin Henning, *Criminalizing Normal Adolescent Behavior in Communities of Color: The Role of Prosecutors in Juvenile Justice Reform*, 98 Cornell L. Rev. 383, 440–41 (2013) (noting that factors such as language skills, limited life experiences, diminished capacity, peer pressure, teenage bravado, and implementation of coping mechanisms—humor, denial, or indifference—make remorse "a particularly unreliable measure of a youth's amenability to treatment and need for punishment"); Lauren M. Kelly, *Admit the Crime or Do the Time: Pennsylvania's Juvenile Transfer Conundrum*, 73 U. Pitt. L. Rev. 563, 579 (2012) (noting that paradoxically "[b]y requiring the juvenile to take responsibility for his action and show remorse," that "the juvenile is implicitly required to admit guilt"). *See generally* Martha Grace Duncan, *"So Young and So Untender": Remorseless Children and the Expectations of the Law*, 102 Colum. L. Rev. 1469 (2002) (exploring the inability of courts to correctly adjudge remorse in juveniles, and questioning the validity of remorsefulness in predicting recidivism and rehabilitation); Saper, *Juvenile Remorselessness*, 38 N.Y.U. Rev. L. & Soc. Change at 99 (framing consideration of remorselessness in the sentencing of juveniles as unconstitutional due to key developmental differences in youth and adults regarding remorse, and the propensity of courts to mistake hallmarks of juvenile developmental immaturity as dispositive of remorselessness). The district court does not appear to have utilized a "first and foremost" and "children are different" framework in evaluating the lack of remorse. Again, "[p]erceptions applicable to adult behavior cannot normally be used

to draw conclusions from juvenile behavior." *Roby*, 897 N.W.2d at 147. On the remorse issue, Majors erroneously was treated like an adult by the district court.

**I. A Note on Discretion.** We have indicated that the review of a district court sentence applying *Miller* factors is for abuse of discretion.[13] But this does not mean the discretion is freestanding and without bounds. Indeed, while an element of discretion may be involved, that discretion may only be exercised when the state makes a compelling case that the *Miller* factors defeat the ordinary presumption against imposition of the mandatory minimums for juvenile offenders. The discretion must be exercised in a fashion that recognizes that the ability of judges to predict which offenders will return to crime is quite limited[14] and that subjective decisions are not very useful and can lead to serious fairness concerns.

Unbridled district court discretion would have several unacceptable consequences. First, it would allow for a variable enforcement of constitutional rights. Second, it would further open the door to implicit bias that is already rampant in our criminal justice system. *See* Jeffrey Fagan, *The Contradictions of Juvenile Crime & Punishment*, Daedalus, Summer 2010, at 43, 51–52 (noting that "[r]acial disparities in juvenile detention and incarceration closely resemble racial disparities in the imprisonment and jailing of adults," as well as providing statistics and analysis to that effect); Sandra Graham & Brian S. Lowery, *Priming*

---

[13]Although I joined the *Roby* decision in its entirety, upon reflection, I doubt that the abuse of discretion standard is the correct standard when constitutional claims are at stake. Constitutional claims must apply equally across all cases and should not be subject to variabilities in the exercise of judicial discretion.

[14]For instance, in an amicus brief filed in *Miller*, juvenile court judges explained that "the criminal justice system cannot predict what kind of person a fifteen-year-old juvenile offender will be when he is 35 or 55 or 75." Brief of Former Juvenile Ct. Judges as Amici Curiae in Support of Petitioners at 1, *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455 (Nos. 10–9646, 10–9647) 2012 WL 135044, at *1.

*Unconscious Racial Stereotypes About Adolescent Offenders*, 28 Law & Hum. Behav. 483, 499 (2004) (analyzing the results of two studies on racial disparities in the juvenile justice system, finding generalized racial bias, and noting that "[e]ven decision makers with good intentions are susceptible").

**J. Summary.** Writing a few years ago, Scott et al., declared that "adhering to the Court's developmental framework and limiting the impact of punitive impulses toward juvenile offenders generally poses an ongoing challenge." Scott et al., *Juvenile Sentencing Reform*, 88 Temp. L. Rev. at 714. They are certainly correct.

Unfortunately, this case represents unprincipled backsliding. Stripped of the window dressing, the hearing in this case was the kind utilized, day in and day out, in the sentencing of adults. For the reasons stated above, the sentence in the case must be vacated and the case remanded for a new sentencing hearing.

**II. Ineffective Assistance of Counsel.**

**A. Introduction.** On appeal, Majors claims that his counsel was ineffective at his resentencing hearing. For reasons that completely escape me, criminal defense lawyers all too often regard sentencing hearings as requiring them only to review a presentence investigative (PSI) report for errors or mistakes and to present a smattering of argument to the judge prior to sentencing. *See State v. Hill*, 878 N.W.2d 269, 275–76 (Iowa 2016) (Appel, J., concurring specially) (noting the critical nature of sentencing within criminal proceedings and exploring the professional responsibilities of attorneys related to sentencing). In our current system, where plea bargaining is the norm, the sentencing proceeding is the most important part of a criminal proceeding.

There has been recognition in the literature that sentencing is given short shrift by the participants.  As noted by one authority, "[s]entencing is too often considered an afterthought rather than seen as a critical stage in a criminal case."  Cait Clarke & James Neuhard, *"From Day One": Who's in Control as Problem Solving and Client Centered Sentencing Takes Center Stage*?, 29 N.Y.U. L. Rev. & Soc. Change 11, 12 (2004).  As discussed below, the problem becomes more acute when dealing with a juvenile offender.

**B.  Applicable Standards for Ineffective Assistance of Counsel.**
The American Bar Association's Center for Criminal Justice states that counsel in a criminal case "has a duty independently to investigate the client's circumstances, including such factors as previous history, family relations, economic condition, and any other information relevant to disposition."  Juvenile Justice Standards: Standards Relating to Counsel for Private Parties, standard 9.2(b)(ii), at 175 (Inst. Judicial Admin. & Am. Bar Ass'n 1980).  Further, a defense lawyer "should present all arguments or evidence which will assist the court or its agents in reaching a sentencing disposition favorable to the accused" and should verify, supplement, or challenge information in any presentence report made available to the defense "rather than relying on the court's presentence report."  Standards for Criminal Justice, standard 4-8.3(c), (e) (Am. Bar Ass'n 4th ed. 2015).

A go-along-to-get-along philosophy does not comport with effective assistance for a criminal defendant.  As stated in the ABA Standards for Criminal Justice: Prosecution Function and Defense Function 4-1.2(e), at 120–21 (3d ed.1993),

> Advocacy is not for the timid, the meek, or the retiring. Our system of justice is inherently contentious, albeit bounded by the rules of professional ethics and decorum, and it demands

that the lawyer be inclined toward vigorous advocacy. Nor can a lawyer be half-hearted in the application of his or her energies to a case. Once a case has been undertaken, a lawyer is obliged not to omit any essential lawful and ethical step in the defense, without regard to compensation or the nature of the appointment. . . .

Because the law is a learned profession, lawyers must take pains to guarantee that their training is adequate and their knowledge up-to-date in order to fulfill their duty as advocates.

*Id.* cmt., at 122–23 (footnote omitted); *see also State v. Clay*, 824 N.W.2d 488, 495–96 (Iowa 2012).

It is not enough for counsel at sentencing to simply look over the PSI report, make a few corrections, and plead for mercy. Counsel must engage in thorough preparation, develop a sensible plan, and mount a vigorous mitigation defense. *See generally* Miriam S. Gohara, *Grace Notes: A Case for Making Mitigation the Heart of Noncapital Sentencing*, 41 Am. J. Crim. L. 41 (2013) (noting the success of well-prepared investigation and presentation of mitigating life history in legal proceedings). The need for zealous counsel is critical in cases involving juvenile sentencing. There can be a temptation, contrary to the teachings of *Roper*, *Miller*, *Null*, and *Roby*, to sentence juveniles harsher than adults on the ground that early onset of violent criminal activity shows a particularly depraved person. But a sentencing judge must be given the proper understanding of child developmental psychology before sentencing a juvenile offender to an adult sentence.

Not surprisingly, Juvenile Justice Standards provide that "[t]he lawyer should seek to secure the assistance of psychiatric, psychological, medical or other expert personnel needed for purposes of evaluation, consultation or testimony with respect to formation of a disposition plan." Juvenile Justice Standards: Standards Relating to Counsel for Private Parties, standard 9.2(c), at 177; *see* Barbara Fedders, *Losing Hold of the*

*Guiding Hand: Ineffective Assistance of Counsel in Juvenile Delinquency Representations*, 14 Lewis & Clark L. Rev. 771, 796 (2010) (noting the systematic failure of juvenile delinquency attorneys to gather necessary records or hire experts). *See generally* Beth Caldwell, *Appealing to Empathy: Counsel's Obligation to Present Mitigating Evidence for Juveniles in Adult Court*, 64 Me. L. Rev. 391 (2012) [hereinafter Caldwell, *Appealing to Empathy*] (discussing broadly the professional obligations of attorneys to present mitigating evidence and the impact such mitigation may have on case outcomes).

Attorneys have a range of responsibilities unique to juvenile representation. By way of example,

> the National Juvenile Defender Center interprets the duties of competence and diligence to require that juvenile defense attorneys are "well-versed in the areas of child and adolescent development" and have a "working knowledge," and contact with experts, in "collateral consequences" of conviction, special education, abuse and neglect, cultural competence, and mental health. In addition, these standards indicate that competent juvenile defense counsel should consult "with mitigation specialists, social workers, and mental health, special education, and other experts to develop a plan consistent with the client's expressed interests" at the disposition hearing. Counsel should also "prepare[] and present[] the court with a creative, comprehensive, strengths-based, individualized disposition alternative consistent with the client's expressed interests." Although these standards relate to the representation of juveniles in delinquency court, they are germane to representing juvenile offenders in adult court.

Caldwell, *Appealing to Empathy*, 64 Me. L. Rev. at 410–11 (quoting Robin Walker Sterling, Nat'l Juvenile Defs. Ctr., *Role of Juvenile Defense Counsel in Delinquency Court* 14, 18 (2009)).

These standards are designed to apply in juvenile adjudications, but it is inconceivable to me that a lesser standard would apply in a criminal

sentencing proceeding involving a juvenile or in a resentencing hearing of a juvenile offender.

**C. Application of Standards.** In light of these standards, a strong case can be made that Majors' counsel was ineffective. In considering a resentencing of a juvenile offender, the fact finder must be introduced to the science of adolescent brain development in some fashion. Such evidence may be received through an expert who testifies about what is known of adolescent brain development and its corresponding thought processes. Jenny E. Carroll, *The Problem with Inference and Juvenile Defendants*, 45 Fla. St. U. L. Rev. 1, 49 (2017) (noting that "[s]uch testimony could occur in two forms: an expert could evaluate a particular defendant and testify as to her cognitive processes, or an expert could speak more broadly to what is generally known of adolescent brain development and its corresponding thought processes" (footnote omitted)).

But Majors' counsel took no steps to present the court with this kind of critical information. He did not challenge the qualifications of the State's expert and allowed the prosecutor to ask a long series of leading questions to his expert. His involvement with the generalized state expert was limited to cursory cross-examination of the State's witnesses.

For example, counsel for Majors did not meaningfully challenge the just-short-of-eighteen theory. He did not confront the expert with the many authorities in child psychology to the contrary. And, counsel did not present the caselaw to the contrary to the district court. Indeed, counsel did not provide a brief on sentencing. None of the applicable caselaw was presented to the district court. Similarly, counsel did not explore the "first and foremost" dictates of *Roby*, either through cross-examination of the expert or in his nonexistent briefing before the court.

Counsel offered no evidence at the hearing other than a brief statement from the client. There is certainly nothing in the record to suggest that counsel did any independent investigation of the long list of potentially mitigating leads which would have been revealed from a cursory review of the trial record.

On appeal, the State asserts correctly that the record shows that Majors did not wish to have an independent medical examination and that he explicitly directed his lawyer not to pursue it. There are three problems here. First, an independent medical examination is not what he really needed. No one claimed he had a current medical condition that required diagnosis. Indeed, the State explicitly declined to claim, for instance, that Majors had any diagnosable disorder such as an antipersonality conduct disorder. What Majors' counsel desperately needed, as is abundantly clear in this case, was a child development expert to explain to counsel the fundamentals of child developmental psychology, assist in the development of the case, and offer testimony to support Majors' position. Without such assistance, the counterintuitive principles of child development psychology were wholly unpresented and unexplored in this case.

Second, the decision whether to call an expert witness is not generally a client decision but rests with effective counsel. *See State v. Sammons*, 749 P.2d 1372, 1377 (Ariz. 1988) (en banc) (finding the decision to call an expert witness "a matter of trial strategy" for counsel); *Davis v. State*, 723 S.E.2d 431, 434 (Ga. 2012) (stating that the decision to call experts is "within the broad range of professional conduct afforded trial attorneys"). Further, Majors' expressed preference made no sense. First, there was plenty of time prior to the hearing for his counsel to hire a qualified child development psychologist. Second, if the record was later

supplemented, there was no significant possibility that this decision would have delayed his release. He had not yet taken substance abuse and victim impact programming. There was little possibility that any delay caused by the hiring of a qualified expert witness would have significantly delayed his release from prison. Acquiescing in the client's desire not to hire an expert was the easiest course, but it did not reflect zealous advocacy.

It is also suggested that counsel made a strategic decision not to call an expert because he elicited the testimony he needed from the State's expert. But in light of the completely inadequate testimony obtained from the State's expert, this conclusion simply cannot be sustained. Counsel for Majors seems to have been unaware of the child developmental science and the applicable Iowa caselaw. It is difficult to understand the strategic reasoning behind not hiring a qualified expert to prevent the risk of a runaway train based upon unqualified expert opinion.

In addition to the question of duty, there is the question of prejudice. In order to find prejudice, our confidence in the outcome must be undermined. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068 (1984) ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different . . . [which is] sufficient to undermine confidence in the outcome."); *Ledezma v. State*, 626 N.W.2d 134, 143 (Iowa 2001) (applying the *Strickland* ineffective-assistance standard in Iowa caselaw). Based on the above, my confidence in the sentencing outcome is definitely undermined. The district court simply did not have the benefit of an appropriate presentation that explained the principles of child psychology and applied them to the current case.

And there was a lot to work with in this case. With a juvenile offender facing an adult mandatory minimum sentence, there almost always is. Indeed, after examining the aspects of the record explored above—including abuse by his father, polysubstance abuse, teasing about his family's raising of chickens, the nonobvious social and psychological effects of scoliosis, transfer from public school to an alternative school, tearful reminiscence regarding the childhood abuse and teasing inflicted on him, the influence of media as evidence of immaturity, the issues surrounding the psychology of juvenile remorse, the unchallenged use of the just-short-of-eighteen theory by the State, etc.—can *anyone* doubt that Majors would have benefitted had local counsel hired a consulting or testifying expert in child developmental psychology? And had that happened, isn't there, at the very least, a fair chance a different result would have occurred?

I do not need to decide the ineffective-assistance-of-counsel issue, because I would reverse the sentence in this case as a result of the manifest errors in the analysis and remand the case for a new hearing consistent with the substance of this opinion. But I wish to make it very clear that we judges should expect, and our system of justice should demand, zealous and tenacious advocacy from counsel at a resentencing hearing. Zealous advocacy demands that a lawyer representing a juvenile defendant (1) be familiar with the underlying case; (2) have a good working knowledge of the relevant law and child development concepts applicable to imposition of mandatory adult sentences on juvenile offenders; (3) conduct a thorough, independent investigation of background facts that might support mitigation; and (4) present expert testimony in child developmental psychology to put the mitigation evidence in its proper context. What is plainly not acceptable is a brief review of the file and any

PSI report, a passive approach to extensive leading questions of an unqualified expert, a seat-of-the-pants cross-examination, a failure to call an expert in child psychological development, and the failure to even file a brief with the district court.

The majority rules, as a matter of law, that counsel was not ineffective. I disagree. But at a minimum, it is hard to understand why the matter should not be preserved for postconviction relief to see what counsel did and did not do and what explanations, if any, might be available for the very limited defense offered in the resentencing hearing. The majority instead closes the door, preferring to leave the very substantial questions regarding the use of the State's expert and the lack of appropriate expert response unexplored.

### III. Conclusion.

I do not suggest, of course, that Majors should not be held responsible for his crime. The question is whether the crime "is not as morally reprehensible as that of an adult," because "children are different." *Graham*, 560 U.S. at 68, 130 S. Ct. at 2026 (quoting *Thompson v. Oklahoma*, 487 U.S. 815, 835, 108 S. Ct. 2687, 2699 (1988) (plurality opinion)); *Miller*, 567 U.S. at 480, 132 S. Ct. at 2469. And, of course, the impact of our decision is not whether Majors will be released, but whether he is eligible to be considered for release by the parole board.

For the reasons explained above, I would reverse the sentence in this case and remand the case for a real sentencing hearing in which the propositions that "[f]irst and foremost, the time when a seventeen-year-old could seriously be considered to have adult-like culpability has passed" and the "children are different" framework can be applied as required by our caselaw.

Wiggins, J., joins this dissent.